No. 2--02--0009

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

THE PEOPLE OF THE STATE                                                 )   Appeal from the Circuit Court

OF ILLINOIS,                            )   of Kane County.

)

Plaintiff-Appellee, )

)

v.                             )   No. 98--CF--291

)

NATHANIEL EDWARDS,                   )   Honorable

                                 )   Donald C. Hudson,

Defendant-Appellant.                             )   Judge, Presiding.

______________________________________________________________________________

JUSTICE KAPALA delivered the opinion of the court:

Following a jury trial in the circuit court of Kane County, defendant, Nathaniel Edwards, was found guilty of felony murder (720 ILCS 5/9--1(a)(3) (West 1998)) predicated upon the offense of robbery (720 ILCS 5/18--1 (West 1998)) and was sentenced to natural life imprisonment.  On appeal defendant contends that he was denied a fair trial due to: (1) the trial court's failure to 
sua
 
sponte
 instruct the jury with the definition of robbery; and (2) the violation of a pretrial order prohibiting reference to a statement defendant allegedly made that he had killed before and would kill again.  For the reasons that follow, we affirm the judgment of the circuit court. 

I. FACTS

On January 22, 1999, David Suter was found strangled to death on the floor of his home at 441 North Highland Avenue, Aurora.  Thereafter, defendant was indicted for three counts of first-degree murder.  In count I it was alleged that defendant committed first-degree murder in that he strangled Suter with the intent to kill (720 ILCS 5/9--1(a)(1) (West 1998)).  In count II it was alleged that defendant committed first-degree murder in that he strangled Suter knowing that such act created a strong probability of death or great bodily harm (720 ILCS 5/9--1(a)(3) (West 1998)).  In count III it was alleged that defendant committed first-degree murder in that he strangled Suter while committing the forcible felony of robbery (720 ILCS 5/9--1(a)(3) (West 1998)) (felony murder).  

At trial Carl Henry Neal, the victim's friend and handyman, testified that the victim telephoned him in the evening on January 21, 1999, and asked him to come over the following morning to install a dryer vent.  The next morning Neal arrived at the victim's house and let himself in with his key.  Neal found the normally orderly house in disarray and the victim lying on the floor with a cord around his neck.  Neal said that defendant is married to Neal's sister, Kattye Neal Edwards.  Neal testified that defendant had helped him do some work at the victim's house earlier in the week of the victim's death.

Defendant's wife, Kattye Neal Edwards, testified for the State in exchange for the State's recommendation that she receive probation on a charge of possessing stolen property.  In January 1999, Kattye lived part-time at her mother's house and part-time at defendant's apartment.  At 6 p.m. or 6:30 p.m. on January 21, 1999, she arrived at defendant's apartment.  Defendant was there preparing to go out.  Kattye said defendant left the apartment about 15 or 20 minutes after she arrived.  Defendant returned to the apartment an hour to an hour and one-half later.  Kattye saw defendant take his clothes off, including a pair of blue coveralls.  Defendant bundled up his clothes, left the apartment, and returned without them.  Kattye and defendant left the apartment in a small light-colored compact vehicle.  Kattye identified a photograph of the victim's white Geo Metro as the vehicle in question.  Kattye said that defendant did not own such a vehicle but that he started it with a key.  They drove to a residence at 19 North Highland hoping to find James "Ricky" Taylor.  When they reached the house, Kattye and defendant found Taylor and a woman named Rose Faulkner Neal in the living room.  Kattye sat and spoke to Rose and they smoked some cocaine while defendant spoke with Taylor on the other side of the room.  Defendant left the house and returned with two speakers and some stereo equipment.  Kattye saw defendant hand Rose a cellular telephone and also saw Taylor and Rose give defendant some rock cocaine.  According to Kattye, defendant told Taylor and Rose that they would find out tomorrow or read about where defendant obtained the stereo equipment and the cellular telephone.  Kattye and defendant left and went back to defendant's apartment where they smoked the crack cocaine.  Kattye related that in January 1999 she used cocaine a couple times a week but she did not consider herself an addict. 

Detective William Jeffers testified that he interviewed defendant at the Aurora police station on February 3, 1999.  During that interview defendant admitted that he knew the victim and had been at his house to do some work.  Defendant also told Jeffers that he had seen the victim once at Carl Neal's house and also at Carl Neal's mother's house.  Defendant said that he had been in the victim's car on an occasion when they went to get lumber and that he sat in the backseat.  Defendant denied being at the victim's house on January 21, 1999.  Defendant claimed that on the evening of January 21, 1999, he was drinking and then around 9 p.m. he walked over to a man's house around the corner.  Jeffers said that defendant gave the name Brian but did not know Brian's last name.  Defendant said that he and Brian went out to buy some lottery tickets but that the place was closed.  

Jeffers also testified that on the morning following the first interview defendant indicated that he wanted to talk to Jeffers again.  Jeffers met with defendant and recorded the interview.  A recording of the interview was played for the jury.  During the interview defendant said, "I want to talk about the charges that I'm being charged with and that there are other people involved that have not been charged with anything."  When asked who were the other people involved, defendant said, "Kattye Neal and Rick Taylor."  When asked how Kattye Neal was involved, defendant said "that she was an accessory."  When asked if Kattye Neal was inside David Suter's house with him, defendant said "yes."  When asked how they got into the house, defendant said Kattye Neal knocked on the door and the victim let them into his house.

In exchange for the dismissal of three criminal charges pending against him on which he had served 24 months in pretrial custody, James Taylor agreed to testify for the State.  Taylor said that he has known defendant for over 25 years and that Kattye's niece was his former girlfriend.  Taylor related that on January 21, 1999, he was at 19 North Highland with Rose Neal when defendant and Kattye arrived.  Defendant told Taylor that he had some stereo equipment, a cable box, and a cellular telephone for sale that belonged to a friend who wanted to get rid of the items.  Taylor told defendant that he did not want to buy the items but Rose said to bring them in the house.  Defendant brought in a cellular telephone, a compact disc player, a cable box, a cassette player, and some speakers.  Defendant again asked Taylor if he wanted to buy the items.  Taylor said that he did not because he was out on bond.  Rose said that she wanted the items.  Defendant also said that he had a car for sale.  Taylor identified a photograph of the victim's white Geo Metro as the vehicle defendant tried to sell.  Taylor testified that he gave Rose $75 and 1.7 grams of rock cocaine and that Rose handed the money and drugs to defendant.  Taylor said that defendant looked nervous that night.  According to Taylor, defendant said something about reading the newspaper the next day.  Taylor also testified that in the late evening on January 22, 1999, he went to Kattye and Carl's mother's house and saw defendant there.  According to Taylor, when he walked in the door, defendant got up from the kitchen table and said that he wanted to talk.  Taylor's testimony proceeded as follows:

"[ASSISTANT STATE'S ATTORNEY:] Okay.  Was there anybody else on the porch besides you and the defendant?

[TAYLOR:] Just me and the defendant.

[ASSISTANT STATE'S ATTORNEY:] Okay.  What, if anything, did he say to you, and what, if anything, did you say to him?

[TAYLOR:] He -- he said that -- he said that he went over to Carl's house, and the old man was running off at the mouth, stuff like that there.

[ASSISTANT STATE'S ATTORNEY:] And did you say anything back to him?

[TAYLOR:] Then I said that -- what I said, I said that what you did wasn't right.

[ASSISTANT STATE'S ATTORNEY:]  Okay. What, if anything, did he say to you?

[TAYLOR:] He said that you didn't know the old man.

[ASSISTANT STATE'S ATTORNEY:] What did you say?

[TAYLOR:] I said that you shouldn't killed him.  He said that he didn't have no other choice, he came home."

Taylor testified further that he was present at 19 North Highland when a police officer came and took possession of the items defendant had sold.  Taylor made an in-court identification of the two speakers, the cable box, the compact disc player, the cassette player, and the cellular telephone that defendant sold for money and drugs at 19 North Highland and that were seized by police.

Rose Faulkner Neal testified while she was in custody on an alleged violation of her probation for a forgery charge.  Rose testified that she was living at 19 North Highland on January 21, 1999, and that Taylor was there with her when Kattye Neal and defendant arrived.  According to Rose, defendant told Taylor that he had some stereo equipment for sale but Taylor said that he did not want it.  Defendant brought two speakers, a compact disc player, a cable box, a cassette player, and a cellular telephone into the house. Rose said that defendant handled everything with gloves.  Rose testified that she needed a cellular telephone so she took it and used it thereafter.  According to Rose, she did not handle any money or drugs, and it was Taylor who purchased the items.  Rose testified that defendant also said that he had a vehicle for sale.  Rose went outside and looked at the vehicle and asked defendant if he had a title for the vehicle.  Defendant said that he did not and that he just needed to get rid of it that night.  Rose and Taylor told defendant that they did not want the vehicle.  Rose also testified that defendant said that they would probably read about this in the newspaper the next day.  Rose said that Kattye and defendant got into the vehicle and left.  

Rose explained that ultimately she took the police to the basement at 19 North Highland and showed them the items defendant sold that night.  Rose made an in-court identification of the two speakers, the compact disc player, the cable box, the cassette player, and the cellular telephone that defendant brought to 19 North Highland on the night in question and that were seized by the police.  Rose also identified a photograph of the victim's white Geo Metro as the vehicle that defendant and Kattye had on the night in question and that defendant tried to sell.

Other evidence presented at trial established that the victim went to the Ace Hardware store at 994 North Lake Street, Aurora, at 7:12 p.m. on January 21, 1999, and purchased an aluminum dryer vent.  About 30 minutes later, the victim went back to the store and contemplated exchanging the aluminum vent for a plastic one, but he decided not to and left.  Testimony at trial established that police found a window open at the victim's house and there was a damaged window screen leaning against the house adjacent to that open window.  Police also found a vacuum cleaner cord and a telephone cord wrapped around the victim's neck. The forensic pathologist who performed an autopsy on the victim testified that the cause of death was strangulation.  He also testified that the body showed signs of a struggle or a physical altercation prior to death.  Other evidence established that on January 22, 1999, police located the victim's white Geo Metro in a parking lot one block from defendant's apartment.  The State presented a cellular telephone contract found in the victim's house referencing a Nokia brand cellular telephone and a serial number.  The cellular telephone recovered from Rose Faulkner Neal was a Nokia model with the serial number referenced in the contract.  The State also presented a receipt found in the victim's house for speakers showing serial numbers that matched those on the two speakers recovered from the house at 19 North Highland.  Finally, the State presented an expert witness in the field of microscopy and trace evidence who testified that he found one red fiber matching the fibers composing the victim's shirt on a jacket recovered from defendant's apartment.

Defendant was the only witness called by the defense.  Defendant related that in January 1999, he was working and his wife Kattye was staying with him at his apartment off and on.  Defendant explained that he had "put her out" because she was not working and she was smoking drugs.  Defendant admitted that he was using cocaine in January 1999.  According to defendant, on January 21, 1999, he went to a house on North River Street where he worked until 5 p.m.  Defendant said that he knew he was back at his apartment before dark and was there alone until Kattye arrived.  Defendant said Kattye came in, they spoke, and she lay down with a book.  Defendant said that he left his apartment at 8:40 p.m. and went to the Randall liquor store.  A neighbor named Brian gave him a ride.  Defendant said that he returned to his apartment 20 to 25 minutes later and there was a white car parked outside of his apartment building with stereo equipment in the backseat.  Defendant identified the two speakers, a compact disc player, a cable box, a cassette player, and a cellular telephone that police seized from 19 North Highland as the equipment in the car.  Defendant testified that he and Kattye got into the vehicle and drove to a known drug house.  Defendant said that he drove the vehicle and that Kattye gave him the keys.  After leaving the drug house they drove to a house at 19 North Highland.  According to defendant, he sold the equipment to Ricky Taylor, who paid him in drugs.  Defendant also tried to sell the car, but was unsuccessful.  Defendant said that he and Kattye left in the white car and went back to his apartment, where he dropped Kattye off, and then parked the car somewhere on a street behind his apartment building.

Defendant testified further that he was never in the victim's house on January 21, 1999, and did not strangle the victim.  When asked why he told the police that he and Kattye were in the victim's house on January 21, 1999, defendant said, "I was hurting.  I was really hurting. I felt that I was being railroaded, and I wanted the police to put in custody the other people that was involved with this merchandise."  Defendant said that he did not know how Kattye got the white car and the equipment. 

The jury found defendant guilty of felony murder and not guilty on the other two counts of first-degree murder.  Thereafter defendant was sentenced to imprisonment for natural life based on his having been previously convicted of first-degree murder (730 ILCS 5/5--8--1(a)(1)(c)(i) (West 1998)).  Defendant timely appeals.

II. DISCUSSION

A. Jury Instruction

Defendant's first contention on appeal is that he was denied a fair trial when the trial court failed to 
sua
 
sponte
 instruct the jury as to the definition of robbery, the predicate offense in the felony murder charge.  Defendant prays that we reverse the judgment of conviction and remand the cause to the trial court for a new trial.  We agree that Illinois Pattern Jury Instruction, Criminal, No. 14.01 (Illinois Pattern Jury Instructions, Criminal, No. 14.01 (4th
 ed. 2000) (hereafter IPI Criminal 4th)), defining the offense of robbery, should have been given to the jury in this case.  However, we find that defendant waived this issue and that the plain error exception is inapplicable.

As to the felony murder charge, the jury was given IPI Criminal 4th No. 7.01 
defining felony murder with the forcible felony of "robbery" indicated as the predicate offense.  The jury was not provided with the definitional instruction on robbery as the committee note to IPI Criminal 4th No. 7.01 clearly requires:

"When paragraph [4] is given, insert in the blank the applicable forcible felony from those listed in 720 ILCS 5/2--8 (except second degree murder).  Follow this instruction with the instruction defining that forcible felony."  IPI  Criminal 4th No. 7.01, Committee Note, at 187.

While committee comments are not the law, the trial court is allowed to deviate from the suggested instructions and format only where necessary to conform to unusual facts or new law (
People v. Banks
, 287 Ill. App. 3d 273, 280 (1997)), 
neither of which was present here.
 

Defendant concedes that defense counsel did not object to the jury instructions tendered by the State on felony murder.  Defendant also concedes that his trial counsel did not tender IPI Criminal 4th No. 14.01, defining robbery, or address the missing instruction issue in his posttrial motion for a new trial.  Our supreme court has stated:

"It is well established that the failure to object at trial to an asserted error in jury instructions waives the question [citations] and that no party may raise on appeal the failure to give an instruction unless he tendered it at trial [citations].  This court has also repeatedly recognized that issues not raised in a post-trial motion following a jury trial are effectively waived for appellate review."  
People v. Huckstead
, 91 Ill. 2d 536, 543 (1982).

Therefore, defendant has waived appellate review of this issue.

Defendant contends, however, that the trial court's failure to 
sua
 
sponte
 instruct the jury on the definition of robbery was plain error.  In response, the State argues that no fundamental error occurred, that the evidence was not closely balanced, and, therefore, that review under the plain error exception is inappropriate.

The plain error rule in this context is articulated in Supreme Court Rule 451(c), which provides that "substantial defects [in jury instructions in criminal cases] are not waived by failure to make timely objections thereto if the interests of justice require."  177 Ill. 2d R. 451(c).  In 
Huckstead 
our supreme court explained that this exception to the waiver rule "is restricted to the correction of 'grave errors' [citations] or to situations where the case is close factually and fundamental fairness requires that the jury be properly instructed."  
Huckstead
, 91 Ill. 2d at 544.

Defendant argues that in 
People v. Hopp
, 336 Ill. App. 3d 523 (2002), 
appeal
 
allowed
, 203 Ill. 2d 557 (April 2, 2003), the Third District held that where the parties do not submit a mandatory instruction the trial court is obligated to give the jury the instruction 
sua
 
sponte
, and that the failure to do so is plain error.  Defendant therefore concludes that because the omitted jury instruction in this case was likewise mandatory he is automatically entitled to a new trial.

In 
Hopp
 the defendant was found guilty of conspiracy to commit first-degree murder.  
Hopp
, 336 Ill. App. 3d at 524.  On appeal the defendant argued that it was error for the trial court not to submit an instruction on the definition of first-degree murder when it instructed the jury on the definition of conspiracy to commit first-degree murder.  
Hopp
, 336 Ill. App. 3d at 525.  The 
Hopp
 court found that the committee note to IPI Criminal 4th
 No. 6.03 mandates that the jury be given the instruction defining the offense that is the subject of the conspiracy.  
Hopp
, 336 Ill. App. 3d at 526.  The 
Hopp
 court concluded:

"[I]t is a substantial and prejudicial defect in the trial and, therefore, reversible error to fail to give the mandatory definitional murder instruction in a case alleging conspiracy to commit first degree murder.  As we have previously indicated, it is the responsibility of the parties to submit the necessary instructions, but we hold that in the case of a mandatory instruction, the trial court should submit it 
sua sponte
 if the parties fail in that responsibility.  Not to do so is, we believe, plain error."  
Hopp
, 336 Ill. App. 3d at 529.

We disagree with the 
Hopp
 court's analysis.  It appears that 
Hopp
 adopts a 
per
 
se
 rule of reversible error when a mandatory jury instruction is not given.  This is not the law.  Rather, it is necessary to apply the test stated in 
Huckstead
 to determine if the issue raised alleges plain error and can be considered on appeal under Rule 451(c).    If the 
Huckstead
 test is met, it then becomes necessary to determine whether the error was prejudicial or harmless.   This two-stage analysis (
i.e.
, plain error analysis followed, if necessary, by harmless error analysis) was applied by our supreme court in  
People v. Layhew
, 139 Ill. 2d 476 (1990), where, after finding that the alleged error constituted plain error, the court held:

"The trial court‛s failure to give [the instruction on the  presumption of innocence], however, although error, does not automatically result in a finding that defendant‛s constitutionally protected right to a fair trial has been violated. [Citation.]  That is, a reviewing court must look to all the circumstances to determine whether defendant received a fair trial, 'including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors.' "  
Layhew
, 139 Ill. 2d at 486, quoting 
Kentucky v. Whorton
, 441 U.S. 786, 789, 60 L. Ed. 2d 640, 643, 
99 S. Ct. 2088, 2090 (1979).
 
  

The 
Hopp
 court did not apply the 
Huckstead
 analysis in order to determine whether the instructional error was reviewable as Rule 451(c) plain error.  Moreover, it erroneously concluded that plain error is necessarily reversible error.   See 
Hopp
, 336 Ill. App. 3d at 532 (Holdridge, J., specially concurring in part and dissenting in part) ("Although [the IPI Criminal 4th committee notes] call for an instruction on the intentional killing aspect of first degree murder in a conspiracy case, they do not resolve the instant issue -- whether the absence of such an instruction rises to the level of reversibility").  Consequently, we reject the 
Hopp
 court's analysis and defendant's argument that the omission of the mandatory jury instruction on the definition of robbery in this case entitles him to a new trial without further analysis.  We will apply the test stated in 
Huckstead
 to determine whether the failure to give the missing jury instruction is reviewable as Rule 451(c) plain error.      

1. Grave Error

 Through the tendered instructions defining felony murder and delineating the elements of that offense (IPI Criminal 4th Nos. 7.01, 7.02), the jury was instructed that the State was required to prove beyond a reasonable doubt that when defendant performed the acts which caused the victim's death he was committing the forcible felony of robbery.  Our supreme court has held:

"Fundamental fairness includes, among other things, seeing to it that certain basic instructions, essential to a fair determination of the case by the jury, are given.  Instructions on the elements of the offense are among these basic instructions, and we have recognized that the trial court has responsibility for ensuring that they are given. [Citation.]  The failure correctly to inform the jury of the elements of the crime charged has been held to be error so grave and fundamental that the waiver rule should not apply."  
People v. Ogunsola
, 87 Ill. 2d 216, 222 (1981).

 In this case, however, we are not dealing with an omitted instruction on an 
element
 of the offense of felony murder;
 the instructions given to the jury identified each element of the offense as required by IPI Criminal 4th No. 7.02.  
It is important to note that IPI Criminal 4th No. 7.02, the instruction on the elements of first-degree murder, does not require that the jury be provided with any instructions regarding robbery.

The instruction that was  missing
 in this case should have been given in conjunction with the 
definitional
 instruction of felony murder (IPI Criminal 4th No. 7.01, Committee Note) and, even here, the committee note to that instruction requires that the jury receive not the instruction on the elements of robbery but, rather, the more general instruction defining robbery.  See IPI Criminal 4th User's Guide ("[definitional instructions] are written in general terms and do not mention the defendants on trial").  The definitional instruction for robbery provides: 

"A person commits the offense of robbery when he [(intentionally) (knowingly) (recklessly)] takes property from the person or the presence of another by the use of force or by threatening the imminent use of force."  IPI Criminal 4th No. 14.01.

The requirement of a definitional instruction on the underlying offense, and not an elements instruction, may be due in part to the fact that proof that the underlying felony occurred is not used to establish that felony 
per
 
se
, but is used to establish the requisite substitute criminal intent for felony murder (
People v. Gulliford
, 86 Ill. App. 3d 237, 244 (1980)).  In order to sustain a charge of felony murder
 the State is not required to prove an intentional murder. 
People v. Shaw
, 186 Ill. 2d 301, 322 (1998).  The underlying forcible felony substitutes for the intent to commit murder.  
People v. Jenkins
, 190 Ill. App. 3d 115, 137 (1989).

The State cites 
People v. McClendon
, 197 Ill. App. 3d 472 (1990), in support of its contention that the failure to instruct the jury in this case with the definition of robbery was not plain error.  In 
McClendon
, the defendant was convicted of armed violence  based on his being armed while committing the felony offense of  aggravated battery.  
McClendon
, 197 Ill. App. 3d at 474.  Among the defendant's contentions on appeal was that the absence of a jury instruction defining battery deprived him of a fair trial.  
McClendon
, 197 Ill. App. 3d at 479.  The reviewing court found this issue waived, but conducted a plain error analysis because it concluded that the defendant's contention could be viewed as an argument that the jury was not properly instructed on the elements of armed violence.  
McClendon
, 197 Ill. App. 3d at 480.  The reviewing court noted that the IPI committee note (IPI Criminal No. 11.07, Committee Note, at 210 (2d ed. 1981)) stated that a definition of battery should be given whenever the jury is instructed on aggravated battery.  
McClendon
, 197 Ill. App. 3d at 480.  The 
McClendon
 court cited authority for the proposition that a term that is employed in a general, nontechnical context need not be defined, and pointed out that the statutory definition of battery was comparable with the  dictionary definition of that term.  
McClendon
, 197 Ill. App. 3d at 480.  In concluding that no plain error occurred under the facts of that case, the reviewing court said that "it could fairly be stated that the jury would have understood the meaning of battery in this case."  
McClendon
, 197 Ill. App. 3d at 481. 

While we recognize that the statutory definition of robbery was not supplied by the attorneys in their closing arguments, by the court or the attorneys in 
voir
 
dire
, or in the jury instructions, we do not believe the absence of a jury instruction on the definition of robbery constitutes grave error.  Rather, we believe that the instructional gap in this case was sufficiently filled in the same manner that the instructional gap was filled in 
McClendon
.  Robbery is defined as taking of property from the person or presence of another by the use of force or by threatening the imminent use of force.  720 ILCS 5/1--18(a) (West 2000).  The dictionary definition of robbery is "a larceny from the person or immediate presence of another by violence or threat of violence."  Webster‛s Third New International Dictionary 1964 (1986).  Accordingly, we believe that a term that is employed in a general, nontechnical context need not be defined as long as nothing in the instruction obscures its meaning.  
People v. Washington
, 184 Ill. App. 3d 703, 708  (1989).  The use of the term "robbery" in the felony murder instruction given to the jury in this case was unobscured, and the general understanding of the meaning of the term "robbery" provided the jury with the definition it needed to determine whether the State proved defendant guilty of felony murder beyond a reasonable doubt.  As pointed out above, the committee notes to IPI Criminal 4th require that the jury be given not the instruction on the elements of robbery but, rather, just the definition.  We believe that this is to make sure that the jury understands the nature of the underlying forcible felony.  Although people may not understand the nature of all underlying forcible felonies, people commonly understand the nature of simple words like "battery" and "robbery" and there is very little chance of confusion.  See 
People v. Ambrose
, 28 Ill. App. 3d 627, 633 (1975) ("The jury as ordinary laymen have a general knowledge of what constitutes armed robbery which is self-defining").  Consequently, we find no grave error necessitating plain error review under Rule 451(c).

2.
 
Closeness of the evidence and fundamental fairness

While the evidence against defendant in this case is largely circumstantial, it is not closely balanced.  Kattye Neal Edwards testified that defendant left his apartment on foot on the night of the murder and returned in the victim's vehicle, which contained electronic equipment that was later determined to be the victim's property.  Kattye said that, upon his return to his apartment, defendant disposed of some articles of clothing that he had been wearing.  Kattye testified that defendant traded the equipment to Taylor and Rose for crack cocaine.  Kattye also testified that when they asked about the origin of the electronic equipment defendant said that they would read about it tomorrow. Taylor and Rose each testified that, on the night of the murder, defendant traded the victim's electronic equipment for drugs and/or money and that he attempted to sell the victim's vehicle.  They both related that defendant commented that they would read about it in the newspaper the next day.  Additionally, Taylor testified that during a conversation he had with defendant the day after the murder, defendant admitted that he did the killing.  Taken together, the testimony of these witnesses was more than sufficient to prove that defendant was the person who strangled the victim.  The jury was aware of these witnesses' involvement in possessing the items stolen from the victim, their prior convictions, their drug usage, and their deals with the State to obtain their trial testimony,  yet chose to believe their testimony.  It is the function of the jury to assess the credibility of witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence.  
People v. Williams
, 193 Ill. 2d 306, 338 (2000).

On the other hand, defendant's case consisted of his testimony that the victim's car was unexplainably parked in front of his apartment building when he returned from the liquor store, that he did not know how it got there, that he merely helped Kattye sell the electronic equipment within the vehicle, and that he never entered the victim's house on the night in question.  However, defendant's account was impeached by the recorded statement he made to Aurora police detectives, admitting that he was in the victim's house on the night the victim was strangled.  Therefore, we do not consider the evidence in this case closely balanced.  Further, our conclusion  that the instructional gap in this case was filled by the common understanding of the word "robbery," coupled with the fact that the evidence of defendant's guilt was not closely balanced, 
leads us to the conclusion that fundamental fairness does not require that we review this issue under the Rule 451(c) plain error exception to the waiver rule. 

Based on the foregoing, we conclude that the failure to instruct the jury with the definition of the word "robbery" did not amount to grave error and this was not a situation where the evidence was closely balanced such that fundamental fairness required that the jury be properly instructed. Accordingly, the Rule 451(c) exception to the waiver rule is inapplicable.  Having so concluded, we do not reach the issue of the prejudicial nature of this instructional error.

B.  Order 
in
 
limine

Before trial the State filed a motion 
in
 
limine
 seeking a ruling that certain statements made by defendant to James Taylor shortly after the murder were admissible.  Among the statements defendant allegedly made to Taylor was "I've killed and I'll kill again."  The trial court held that this statement was inadmissible because it would inform the jury that defendant had a prior murder conviction that was previously determined inadmissible for purposes of impeaching defendant's trial testimony.

During Taylor's trial testimony, the following exchange took place:

"[ASSISTANT STATE'S ATTORNEY:] Was that basically the end of the conversation?

[TAYLOR:] And then -- then he said he-- that everyday he sees it over at that house.

[ASSISTANT STATE'S ATTORNEY:] Okay.  Let me ask you this.  Was that the only comment that he made to you about he didn't have any choice when he came home?

[TAYLOR:] He said he got killed --

[DEFENSE COUNSEL:] Objection, Judge.

THE COURT: Approach

THE COURT: There's an objection.  What's the basis?

[DEFENSE COUNSEL:] He said it, I killed, I'll kill again."

[ASSISTANT STATE'S ATTORNEY:] Judge, I instructed him I don't know how many times he can't say that.

THE COURT: It doesn't do any good if he says it.  You better move on to something else.

[ASSISTANT STATE'S ATTORNEY:] Right.

[DEFENSE COUNSEL:]  Judge, I object and ask that the jury be instructed to disregard the last remark by the witness.

THE COURT: The jury's instructed to disregard the last remark by the witness."

Defendant contends that the above-quoted testimony denied him a fair trial.  Defendant concedes that the record does not show that Taylor related the "I've killed before and I'll kill again" statement, but argues that the record otherwise reveals that Taylor actually did testify that defendant made that statement.  

On the day following Taylor's testimony, the defense moved for a mistrial based upon violation of the order 
in
 
limine
.  In concluding that Taylor's testimony did not violate the order 
in limine
 and denying the motion for a mistrial, the trial court said, "I didn't hear anything [
sic
] he has killed before or anything like that."  Defendant argues that the record demonstrates that the trial judge and the State originally agreed with defense counsel's assertion that the order 
in
 
limine
 was violated
.  He suggests that it was not until the next day that the trial judge disputed the fact that Taylor's testimony violated the order 
in
 
limine
.  In support of this assertion, defendant points to the trial judge's comment that "[i]t doesn't do any good if he says it," followed by an instruction to the jury to disregard Taylor's last remark.  Defendant also points out that the assistant State's Attorney did not dispute the objection that improper testimony came from Taylor, but instead said that she had repeatedly informed Taylor that he could not say that.  Also, defendant directs our attention to comments by an assistant State's Attorney and one of defendant's attorneys indicating that a barred statement was made by Taylor.

Essentially, defendant contends that the certified record of the proceedings with respect to Taylor's answer to a particular question is inaccurate based on the record as a whole.  The trial court held otherwise:

"The only thing the court can go on when all is said and done is the court's own recollection and the notes of the official court reporter taking down the testimony.  The court‛s recollection would be consistent and is consistent with what the reporter took down.  I heard nothing about I killed before, anything about a before and I killed again.  I did not hear that, and I was listening very carefully, nor did the court reporter.  Based on that the motion for mistrial is denied."

The decision of whether to grant a mistrial is within the discretion of the court.  
People v. Nieves
, 193 Ill. 2d 513, 525  (2000).  A court abuses its discretion where its decision is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view.  
People v. Illgen
, 145 Ill. 2d 353, 364 (1991).  We cannot conclude that the trial court abused its discretion in determining that the certified record of the proceedings was accurate as to the testimony in question.  The statements of the trial court and the assistant State's Attorney, contemporaneous with the questioned testimony, do not necessarily concede that Taylor uttered barred testimony.  The assistant State's Attorney, who was familiar with the testimony that was barred, may have anticipated an utterance that had not yet occurred or had only partially occurred.  The trial court's comment could likewise be construed as anticipatory, rather than a declaration that the witness indeed uttered barred testimony.  Construed as such, the trial court's comment merely related that the State's instructions to the witness would be of no value 
if
 the witness did not abide by them.  Further, the fact that the trial court sustained defendant's objection and instructed the jury to disregard the witness's response can be attributed to an abundance of caution in an effort to remove any possibility, however remote, that the jury could construe the statement "he said he got killed" to mean "I've killed and I'll kill again."  
As to the recollections of the lawyers in the courtroom at the time, they were equivocal.  Moreover, the testimony of the participants in a trial alone is insufficient to prove an inaccuracy in the record.  
People v. Allen
, 109 Ill. 2d 177, 184 (1985).  Thus, the trial court did not abuse its discretion when it denied defendant's motion for a mistrial.

III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

O'MALLEY and BYRNE, JJ., concur.