NOTICE

Decision filed 06/04/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220424-U

NO. 5-22-0424

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Massac County. |
| | ) | |
| v. | ) | No. 17-CF-204 |
| | ) | |
| NICHOLAS PETTY, | ) | Honorable |
| | ) | William J. Thurston, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: There was sufficient evidence to prove the defendant's guilt beyond a reasonable doubt. The defendant's conviction is reversed and the cause is remanded for a new trial where the trial court erred in allowing a lay witness to offer opinions on scientific topics regarding the process of cooking methamphetamine and whether the acetone detected in her urine was related to her use of methamphetamine and the error was not harmless.

¶ 2    Following a jury trial, the defendant, Nicholas Petty, was convicted of criminal sexual assault and sentenced to nine years in prison. On appeal, the defendant argues that there was insufficient evidence to prove his guilt beyond a reasonable doubt because the State's case relied entirely on the testimony of the victim and that testimony was inconsistent, implausible, and incredible; that the trial court abused its discretion in allowing the State to elicit opinion testimony on a scientific topic from the victim who was an unqualified, lay witness; that defendant's trial counsel was ineffective in that he failed to impeach the complaining witness with a prior

1

inconsistent statement and failed to object to inadmissible hearsay testimony; and that he was denied a fair trial in light of the cumulative effect of the unreasonable performance of trial counsel and the trial court's error. For the reasons that follow, we reverse the judgment of conviction and remand the case for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4      On December 27, 2017, the State charged the defendant with one count of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2016)). The State alleged that on or about December 22, 2017, the defendant committed an act of sexual penetration against the victim, J.D., in that by use of force the defendant placed his penis in contact with the sex organ of J.D. The defendant did not dispute that he had sexual intercourse with J.D., but rather asserted the affirmative defense of consent. The trial began on May 17, 2022. An overview of the evidence follows.

¶ 5                                    A. The State's Evidence

¶ 6      The victim, J.D., was 19 years old at the time of the alleged assault, and 24 years old at the time of trial. At the start of her testimony, the prosecutor questioned J.D. about her drug use and her criminal history. J.D. admitted that she began using methamphetamine (meth) when she was 18 years old, and that she used it daily in December 2017. J.D. also admitted that she had a criminal history and that much of it was related to her meth use. J.D. testified that she had a juvenile adjudication in 2012 for theft over $500, a 2017 conviction for wire fraud involving a check, and a 2018 conviction for trafficking of a controlled substance. The prosecutor then focused on the events of December 21, 2017, and December 22, 2017.

¶ 7      On December 21, 2017, J.D. and her friend, Brian Powell, went to the home of Anna Sullivan, to design some tattoo art for her. Sullivan, a local drug dealer, lived with her husband, Danny, in Metropolis, Illinois. When J.D. and Powell arrived at the Sullivans' home, Anna

2

Sullivan, Danny Sullivan, and a third person were raking leaves in the yard. J.D. and Powell smoked meth with the others over a two-hour period that day. J.D. testified that she usually injected meth intravenously and that smoking meth did not affect her.

¶ 8    The defendant came to the Sullivans' home sometime after sunset to buy meth from Anna Sullivan. J.D. and Brian Powell were still there. This was the first time that J.D. met the defendant. She did not have much interaction with the defendant that evening. She denied flirting with him. Later that evening, Anna Sullivan asked her guests to leave. As J.D. was preparing to walk over to her mom's house, the defendant offered her a ride. J.D. initially declined the offer, but then changed her mind because it was a cold, rainy night. After leaving the Sullivans' home, the defendant asked J.D. if she wanted to "get high. J.D. replied, "Yes." She believed that the defendant purchased meth from Anna Sullivan that evening, and that they would use his meth. J.D. testified that she had a half gram of her own meth that she purchased elsewhere, but she preferred to save it and use the defendant's drugs. She did not agree to "match" drugs with the defendant.

¶ 9    J.D. testified that the defendant took her to an apartment in the Country Village Apartment complex. Once inside the apartment, J.D. followed the defendant upstairs. J.D. observed a person, later identified as Heather Fuller, asleep in an upstairs bedroom. At that time, the defendant was dating Fuller, and sometimes he stayed at her apartment. J.D. stood near the doorway and watched the defendant attempt to wake Fuller. J.D. could not hear any conversation between the defendant and Fuller. When Fuller did not move, the defendant and J.D. went back downstairs. The defendant went into the kitchen and returned with some material to prepare the meth. J.D. watched the defendant mix his meth with what she thought was water. As the defendant prepared the mixture, he started to act "very paranoid." He said someone was outside, and he went in and out of the apartment. J.D. became concerned that the police might be outside, and she did not want to go to

3

jail sober. She drew some of the meth that the defendant had prepared into a syringe and injected it into her left arm. J.D. testified that she injected the meth into her left arm because she was right-handed and because the injection scars were hidden by the tattoos on her left arm. After injecting herself, J.D. noticed that the meth did not "taste right," and that it "felt sweet and weird." She also noticed that she felt heavy, like she could not move, and she was in and out of it. She explained this was not her usual reaction. Typically, when she used meth, she got a euphoric feeling when she breathed out. She could be up for over 24 hours with just one use. This meth made her sleepy. At some point, when J.D. temporarily regained a level of consciousness, she noticed a mark on her right arm. J.D. stated that it felt like the shot missed the vein and went in between the layers of skin and muscle. J.D. testified that she did not shoot anything into her right arm. She also testified that she did not recall seeing the defendant use the meth that he prepared that night.

¶ 10    J.D. became uncomfortable with the situation. She began texting people. The defendant grabbed J.D.'s cell phone and refused to return it. He clicked on her maps and looked through her messages. After that, the defendant removed J.D.'s jeans and underwear. He started to touch her vagina with his hand. The defendant also tried to put his penis into J.D.'s mouth, and she bit it. The defendant hit her in the head. The defendant then inserted his penis into her vagina. He was not wearing a condom. J.D. testified that she did not consent, and that she said "no," and "stop." The defendant did not stop. He threatened to "end" her if she made a sound. He then ejaculated into her vagina and on her abdomen. J.D. pulled her pants up to preserve the evidence.

¶ 11    The defendant eventually fell asleep. J.D. watched his breathing for 30 to 40 minutes to ensure he was asleep. She then grabbed her phone and texted a number of people. When she was assured that someone was on the way, she quickly left the apartment. J.D. waited outside the apartment complex for about 30 minutes for her friend. She concluded that it was taking too long,

4

so she ran to the home of a family member named Jeff Lewis. Another friend, Adam Burnham, showed up at Lewis's home. Burnham walked J.D. to her mother's house. J.D.'s mother drove J.D. to the hospital. J.D. testified that she did not go to Anna Sullivan's house that morning.

¶ 12    J.D. arrived at the emergency department at about 8:30 a.m. on December 22, 2017. Dr. Rafati and a nurse, Robin Newcomb, performed a sexual-assault examination. Blood and urine samples were taken for toxicology screenings.

¶ 13    At that point, the prosecutor turned to questions about the acetone that was detected in J.D.'s urine sample. Prior to trial, the defendant moved to bar all evidence related to the acetone because the State did not have an expert who could offer an opinion as to why acetone was present in J.D.'s urine, and that motion was denied. The prosecutor asked J.D. if she knew of any reason why acetone would be present in her system. J.D. replied, "Not in amounts you could detect, no." The defendant immediately objected on grounds of foundation and moved to strike. The trial court sustained the objection and struck the question and the answer, but allowed the prosecutor to attempt to establish a foundation for the question. The prosecutor asked J.D. whether she had "any medical history or medical condition" that would lead to the presence of acetone in her system. J.D. responded, "Not at all." The prosecutor asked whether J.D. was diabetic and whether she was taking any medication at that time. J.D. answered each question in the negative. The prosecutor next asked whether J.D. was familiar with the "typical" process for preparing to shoot methamphetamine intravenously. The defendant objected to the foundation. The trial court sustained the objection, but indicated that J.D. could testify about her personal experience. Pursuant to further questions by the prosecutor, J.D. described how she typically prepared methamphetamine for injection. The prosecutor asked J.D. whether any of the substances used in the preparation of methamphetamine contained acetone. Once again, the defendant objected to the

foundation. The court sustained the objection, finding there was no foundational testimony regarding the witness's "knowledge of what acetone is, how it is comprised, and its uses." Pursuant to additional questioning, J.D. testified that she used nail polish remover. She stated that she was familiar with the ingredients, noting that the bottle says "100% acetone or none, depending on if you are using fake or real nails." J.D. further testified that in her experience, there was no reason to use nail polish remover when preparing methamphetamine for injection into the body, and that she would not prepare a shot of methamphetamine with acetone.

¶ 14    J.D. testified that after she was released from the hospital, she went to the police station. She gave a recorded interview to Sergeant Griffey. She testified that she did not think she was still high when she gave the interview, but she was still tired. At the close of the direct examination, J.D. testified that on the night of the assault, she injected the defendant's meth, but she used her own "needle." J.D. identified the defendant as the individual who forcibly placed his penis inside her vagina without her consent.

¶ 15    During cross-examination, J.D. admitted she began using meth when she was 18 years old. Since then, she had injected herself with meth over a thousand times, snorted meth over a hundred times, and smoked meth over a hundred times. She also admitted that she had used meth as recently as six weeks before the trial. J.D. was asked a number of questions regarding the statements she made during her interview with Sergeant Griffey. When asked whether she told Griffey that the defendant struck her in the back of the head, dragged her, and injected an unknown substance into her right arm, J.D. replied, "That's definitely not how it was worded." J.D. admitted that she told Sergeant Griffey that she "matched" drugs with the defendant, but her statement was not correct. Upon further questioning by defense counsel, J.D. testified she had prepared meth for injections, but she had never cooked it. She stated that she knew how meth was made, explaining that she

watched a video about it during her eighth-grade health class. Counsel asked J.D. whether she knew if acetone was used in the production of methamphetamine. J.D. replied, "It could be, but when methamphetamine is finished cooking, it is no longer any of the chemical compounds that are being used to make it." J.D. admitted that she purchased meth from street level dealers. She also admitted that the meth did not come with a list of ingredients, and she did not know who produced it, how it was produced, or how long ago it was produced.

¶ 16    Robin Newcomb was called as a witness in the State's case. Newcomb testified that on December 22, 2017, at approximately 8:32 a.m., J.D. came into the emergency department at Massac Memorial Hospital and reported that she had been sexually assaulted earlier that morning. At that time, Newcomb was a trauma nurse specialist and certified sexual assault nurse examiner on staff in the emergency department.[1] Newcomb interviewed J.D. and obtained a patient history using the questionnaire in the Illinois State Police sexual assault evidence collection kit. She recorded the history in the hospital record and on the forms included in a sexual assault evidence collection kit provided by the Illinois State Police. Referring to those records, Newcomb recounted that history as follows. J.D. reported that she accepted a ride from the defendant late in the evening on December 21, 2017. The defendant drove J.D. to an apartment complex. While inside the apartment, J.D. was injected with meth and possibly other substances. J.D. reported that she began feeling sick and was unable to control what she was doing. The defendant took her cell phone. He penetrated her vaginally with his penis. He ejaculated into her vagina and onto her abdomen. The defendant put his penis into her mouth, and she bit his penis. The defendant punched her in the

---

[1]At the time of trial, Newcomb was the manager of the emergency department at Massac Memorial Hospital.

face and threatened to "end her" if she made any noise. J.D. also noted that she discovered a needle mark on her right arm. J.D. stated that she never injected meth into her right arm.

¶ 17    Newcomb conducted a visual examination of the patient from "head to toe" as part of the sexual assault assessment. Newcomb did not observe any lacerations or bruising on J.D.'s body. She noted that the lack of physical marks or bruising was not uncommon. Newcomb documented a possible needle mark on J.D.'s "right antecubital."[2] She did not note any track marks on J.D.'s left arm. Newcomb noted that J.D. reported a bi-polar diagnosis and a history of methamphetamine use. Newcomb testified that J.D. did not appear to be under the influence of narcotics at the time of the examination. A sample of J.D.'s urine was submitted for a rapid drug screen, and it was positive for amphetamine and methamphetamine.

¶ 18    Newcomb collected J.D.'s clothing. She also obtained hair samples and vaginal, oral, anal, and abdominal swabs. Each item was bagged and placed into the evidence collection kit, and the kit was sealed. A urine sample was taken from J.D. and preserved for testing by law enforcement. Newcomb turned over the evidence collection kit and the urine sample to Sergeant Ricky Griffey of the Metropolis City Police Department later that day.

¶ 19    Dr. Michael Rafati, an emergency department physician, performed a physical examination on J.D. that morning. Newcomb remained in the room throughout the examination. Dr. Rafati testified that he conducted a pelvic examination. He observed no evidence of vaginal tearing, bruising, or lacerations. Dr. Rafati stated that the absence of traumatic injuries was not unusual. Dr. Rafati did not observe any bruising, abrasions, or other signs of physical trauma on J.D.'s body. He noted that injuries can "evolve," and that bruising might not show up for several hours or days.

_____

[2]The antecubital area of the arm is located anterior to the elbow.

¶ 20    Sergeant Ricky Griffey also testified in the State's case. On the morning of December 22, 2017, Griffey responded to the emergency department at Massac Memorial Hospital for a reported sexual assault. When Griffey arrived at the hospital, J.D. was undergoing a sexual assault examination. Griffey left the hospital and returned at approximately 11:20 a.m. He took custody of the sealed sexual assault kit and the sealed urine sample. Those items were then sent to the appropriate Illinois State Police forensic laboratories for analysis.

¶ 21    After J.D. was discharged from the hospital, Griffey drove her to the police department and conducted a recorded interview. Griffey testified that J.D. appeared to be under the influence of narcotics at the time of the interview. He based his opinion on J.D.'s physical demeanor, the way she was speaking, and her admission to using methamphetamine. Griffey could not recall whether he observed track marks on J.D. at that time. After the interview, Griffey drove J.D. to the Country Village Apartment complex, and J.D. pointed out the unit where she had been assaulted. He then drove J.D. home. As part of the investigation, Griffey determined the unit was leased to Heather Fuller. Griffey returned to the apartment complex, but he did not find Heather Fuller or the defendant at Fuller's apartment. Griffey left his business card, with a note asking Fuller and the defendant to contact him. Neither Fuller nor the defendant contacted him. Griffey also attempted to contact Anna Sullivan, but she did not respond to his request for an interview. The defendant was arrested in Bloomington, Illinois, on January 11, 2018. Subsequently, pursuant to a court order, Griffey obtained a buccal swab sample from the defendant. The sample was sent to the Illinois State Police crime lab for analysis.

¶ 22    During his testimony, Griffey identified a toxicology report containing the results of an analysis of J.D.'s urine sample. Prior to trial, the parties reached a stipulation with respect to that report. The parties stipulated that on February 13, 2018, Shelly Chase, a forensic scientist with the

Illinois State Police, conducted an analysis of the urine collected from J.D., and that if called as a witness, Chase would testify consistent with her findings in her report, but would be unable to testify as to why those substances were in J.D.'s urine. Pursuant to the agreement of the parties, the trial court read the stipulation to the jury. Sergeant Griffey then recited the findings from the toxicology report. Acetone, amphetamine, and methamphetamine were detected in J.D.'s urine sample. After the toxicology findings were presented, the trial court instructed the jurors that they were "not to speculate or guess as to what those substances are or why they were in [J.D.'s] urine." The court further instructed, "You must listen to the testimony presented in court through all of the witnesses. If no such testimony is given as to a specific issue, disregard that issue."

¶ 23    During cross-examination, Griffey acknowledged that Heather Fuller went to the police station to talk with Griffey on two occasions, but he noted that this was only after the defendant was arrested. Defense counsel questioned Griffey about his interview with J.D. During the interview, J.D. reported that the defendant hit her in the back of the head, and that he grabbed her right arm and stuck her with a syringe. Griffey testified that he did not observe any injuries to J.D.'s head or any bruising on her right arm. Defense counsel also attempted to show that Griffey did not conduct a thorough investigation because he failed to search Fuller's apartment, look into J.D.'s cell phone and phone records, interview other residents of the apartment complex, and search the dumpsters at the apartment complex for syringes.

¶ 24    The State also called expert witnesses in forensic biology and DNA analysis. Meredith Misker testified that semen was found on the victim's vaginal and abdominal swabs. Jennifer Mulrean performed a DNA analysis on the semen. Mulrean testified that the DNA analysis revealed the defendant's DNA could not be excluded from the semen on either the vaginal swab

or the abdominal swab. Mulrean testified that the statistic for the defendant's inclusion was 1 in 22 quintillion for the vaginal swab and 1 in 6.7 quintillion for the abdominal swab.

¶ 25    The State called H.M. as its final witness. Prior to the trial, the State filed a motion to permit the introduction of other crimes evidence. Specifically, the State sought to introduce evidence that the defendant sexually assaulted H.M. at the same apartment less than two weeks prior to the charged offense. The trial court granted the State's motion and permitted the evidence to be introduced for purposes of *modus operandi*, lack of mistake, and propensity to commit sexual assaults.

¶ 26    H.M. testified that Heather Fuller was her cousin. On December 8, 2017, H.M. went to the local Walmart with Fuller and the defendant. While inside the store, the defendant began to act paranoid, and he constantly looked behind him. They returned to Fuller's apartment complex, but stayed in the car. Sometime between 1 a.m. and 2 a.m., H.M. went into Fuller's apartment and fell asleep. She woke up about 8 a.m. She went outside and found that Fuller and the defendant were still in the car. When H.M. asked them to come inside, the defendant said that he would if H.M. gave him a hug. H.M. agreed. While inside the apartment, the defendant continued to ask for hugs. H.M. testified that the defendant made her go into Fuller's bedroom and sit next to him. The defendant touched her face and kissed her. He asked if it was ok. She said yes. Then, the defendant touched her breasts and asked if that was okay. She said yes. The defendant continued to touch H.M., and she told him it was making her very uncomfortable. She asked him to stop. H.M. testified that the defendant did not stop until he heard Fuller coming up the stairs.

¶ 27    H.M. testified that she ran into the bathroom and cried. She went back to the bedroom to put on her shoes because she was going to their grandma's house. The defendant came back into the bedroom and told H.M. there was no reason to cry. He climbed on top of H.M. and pinned her

11

down. He kissed her and called her his "baby." H.M. told the defendant that she was not his baby and to get off her. The defendant did so. H.M. identified the defendant as the individual who abused her.

¶ 28    At the close of the State's case-in-chief, the defendant's counsel moved to strike all evidence related to the acetone. Counsel argued that J.D.'s testimony served only to confuse the jury as to the relevance of the acetone and why it would be present in J.D.'s urine. The trial court denied the motion, finding that J.D. testified that "acetone can be used to make methamphetamine" and that she gave a lot of testimony about her knowledge of it.

¶ 29                        B. The Defendant's Evidence

¶ 30    Anna Sullivan was the defendant's first witness. Sullivan testified remotely from the Federal Medical Center in Lexington, Kentucky. In July 2019, she was convicted of seven counts of distribution of methamphetamine and one count of possession with intent to distribute methamphetamine and sentenced to 10 years in prison. Sullivan testified that she lived in Metropolis, Illinois, for over 15 years. Sullivan had been friends with J.D.'s grandparents and had known J.D. since J.D. was eight years old. Sullivan stated that the defendant had come to her home to purchase methamphetamine about three to five times. She admitted that she was his drug dealer.

¶ 31    Sullivan testified that J.D. was a guest at her home on December 21, 2017, and that the defendant arrived later that evening. Sullivan observed that the defendant and J.D. were friendly toward one another. J.D. appeared to be physically attracted to the defendant. J.D. sat on the defendant's lap, and they may have kissed. Sullivan testified that both J.D. and the defendant purchased drugs from her that evening. She noted that they left together. Sullivan stated that she received 8 to 10 text messages from J.D. over the next several hours. She texted back and J.D. replied quickly. Sullivan stated that J.D. returned to Sullivan's home the following morning,

12

sometime between 7 a.m. and 9 a.m., to get a change of clothes. At that time, J.D. did not seem upset. J.D. did not mention that she had been sexually assaulted. Sullivan and J.D. smoked a bowl or two of meth. Sullivan explained that she remembered these specific days because she had only met the defendant a few times and because she heard about J.D.'s allegations against the defendant a few days later.

¶ 32    During cross-examination, Sullivan testified that she was interviewed by a detective from the Metropolis Police Department on December 22, 2022. During the interview, she told the detective she did not remember a lot about the events of December 21, 2017, and December 22, 2017. In a correction to her direct testimony, Sullivan stated that the defendant purchased meth from her on December 21, 2017, and that J.D. did not. Sullivan acknowledged that she received text messages from J.D.'s phone number, but she could not testify that J.D. sent those messages.

¶ 33    Heather Fuller was the defendant's final witness. At the time of the trial, Fuller lived in Paducah, Kentucky, where she worked at a liquor store and as a personal assistant. Fuller testified that she and the defendant dated for about two months, and that she broke up with him at the end of December 2017. Fuller testified that she never used meth or any other narcotics. Fuller recalled that at about 2 a.m. on the morning of December 22, 2017, the defendant entered Fuller's bedroom. The defendant introduced Fuller to J.D., and he asked Fuller if she wanted to have a threesome. She declined. The defendant and J.D. went downstairs. Fuller went downstairs a few minutes later. She saw the defendant and J.D. having sex on the couch. She noted that it was "very consensual" and that both were "into it." J.D. was able to move and change positions during the encounter. Fuller testified that she was about 15 feet away from the couch, and that a dining room light illuminated the area. Fuller watched for about 30 minutes. She testified that watching the defendant have sex with other women was part of their relationship. She never saw the defendant punch,

13

inject, or drag J.D. across the floor. Fuller went back upstairs. She did not see J.D. leave the apartment. Sometime after the defendant was arrested, Fuller went to the police department because she wanted to give a statement. Fuller admitted that she still talked with the defendant every few months.

¶ 34 Fuller was also questioned about the allegations that H.M. made against the defendant. Fuller testified that the defendant often stayed at her apartment in December 2017. She did not recall an occasion when H.M. appeared upset with the defendant during that time. On cross-examination, Fuller testified that she learned of H.M.'s allegation against the defendant at about the same time that she learned of J.D.'s allegation. Fuller acknowledged that she knew about J.D.'s allegation before the defendant was arrested, and that she did not go to the police or tell anyone about her observations until after his arrest. She stated that she was unaware that Griffey wanted to talk with her.

¶ 35 The defense rested and the State offered no rebuttal evidence. Following closing arguments and instructions, the jury retired to deliberate. They returned a guilty verdict. The trial court denied the defendant's posttrial motion and sentenced the defendant to nine years in the Illinois Department of Corrections, followed by a period of three years to life term for mandatory supervised release. This appeal followed.

¶ 36                                 II. ANALYSIS

¶ 37 On appeal, the defendant claims that the State failed to prove his guilt beyond a reasonable doubt. The defendant argues the State's case was based entirely on a complaining witness whose testimony was inconsistent and implausible and who demonstrated a propensity to deceive given her history of heavy drug use and her convictions for crimes of dishonesty. The defendant further argues that J.D.'s testimony was unworthy of belief because her account varied wildly on key

14

events, such as how she was drugged, and because she admitted to using meth over a thousand times during her life.

¶ 38 When presented with a challenge to the sufficiency of the evidence, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318 (1979)); *People v. Cunningham*, 212 Ill. 2d 274, 278-79 (2004). This standard is applied in all criminal cases, regardless of the nature of the evidence. *Cunningham*, 212 Ill. 2d at 279. When considering the sufficiency of the evidence, the reviewing court will not retry the defendant. *People v. Gray*, 2017 IL 120958, ¶ 35. It is the role of the trier of fact to assess the credibility of the witnesses, resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the evidence. *Gray*, 2017 IL 120958, ¶ 35. Accordingly, a reviewing court will not substitute its judgment for that of the trier of fact on questions involving the credibility of witnesses and the weight of the evidence. *Gray*, 2017 IL 120958, ¶ 35. A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt as to the defendant's guilt. *Gray*, 2017 IL 120958, ¶ 35.

¶ 39 The testimony of a single witness is sufficient to convict if the testimony is positive and credible, even when the testimony is contradicted by the defendant. *Gray*, 2017 IL 120958, ¶ 36. Where the finding of the defendant's guilt depends on eyewitness testimony, a reviewing court must decide whether a trier of fact could reasonably accept the testimony as true beyond a reasonable doubt. *Gray*, 2017 IL 120958, ¶ 36; *Cunningham*, 212 Ill. 2d at 279. Testimony may be found insufficient "only where the record evidence compels the conclusion that no reasonable

15

person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280. A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible. *Gray*, 2017 IL 120958, ¶ 36.

¶ 40    In this case, J.D. testified that the defendant assaulted her orally and vaginally during the early morning on December 22, 2017. J.D. testified the defendant placed his penis in her mouth, and that she bit him. She also testified that the defendant forcibly placed his penis into her vagina, without her consent, and that when she told him "no," and to "stop," he threatened to "end her." J.D. further testified that she observed a mark on her right arm and that she never injected herself there. J.D. also testified that she went to the emergency department within hours after the assault, arriving at approximately 8:30 a.m. Robin Newcomb, a registered nurse and certified sexual assault examiner, interviewed J.D. shortly after she arrived at the hospital, and she documented a similar history of the assault. Thus, J.D.'s testimony as to these essential facts was clear and corroborated by another witness.

¶ 41    There were inconsistencies in J.D.'s testimony regarding how she had been drugged. At trial, J.D. testified that she injected herself with meth prepared by the defendant and felt heavy and unable to move. She further testified that later that night she noticed a red mark on her right arm and that she did not inject herself there. Sergeant Griffey testified that when he interviewed J.D., she told him that the defendant hit her on the back of her head, grabbed her right arm, and injected a syringe. In addition, the defendant presented witnesses to support the affirmative defense of consent. Heather Fuller testified that she witnessed the encounter and it appeared "very consensual." However, Fuller also testified that she was in a relationship with the defendant at the time of these events. Fuller acknowledged that she did not report her observations to the police until sometime after the defendant's arrest even though she was aware of J.D.'s allegation. The

16

defendant's other witness, Anna Sullivan, was the local drug dealer who sold the methamphetamine that J.D. ingested. Sullivan testified that she saw J.D. flirt with the defendant during the evening before the assault, and that J.D. came to Sullivan's house the next morning between 7 a.m. and 9 a.m., and did not appear upset. However, during cross-examination, Sullivan admitted that she did not remember some of the details from those days.

¶ 42    Here, the jury had the opportunity to hear J.D.'s testimony and observe her demeanor firsthand, under direct examination and an extensive cross-examination. The jury was fully aware of the inconsistencies in J.D.'s testimony and the extent of J.D.'s drug use. The jury also had the opportunity to observe the demeanor of the defendant's witnesses. The jury was instructed that the testimony of an addict should be scrutinized with caution, and that in judging the credibility and weight of the testimony, they could consider the demeanor, interest, bias, or prejudice of a witness and the reasonableness of his or her testimony in light of all of the evidence presented in the case. Credibility determinations and how certain inconsistencies in the testimony affect the credibility of a witnesses are factual matters for the jury to decide. *Gray*, 2017 IL 120958, ¶ 47. After considering the testimony presented, the jury apparently found J.D. credible and chose to believe her testimony over the testimony of the defendant's witnesses. There is nothing in the record indicating that the inconsistencies in J.D.'s testimony, as identified by the defendant, render the whole of J.D.'s testimony unworthy of belief. *Cunningham*, 212 Ill. 2d at 284. After viewing all of the evidence and the reasonable inferences therefrom in a light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Accordingly, we find that the State presented sufficient evidence to support a conviction for criminal sexual assault.

¶ 43    Next, the defendant claims that he was denied a fair trial because the trial court erred in allowing the State to question J.D., an unqualified lay witness, about the scientific topic of whether the acetone detected in her urine was related to her methamphetamine use. In response, the State argues that J.D. testified based upon her personal knowledge about the subject.

¶ 44    The admission of evidence, including lay opinion testimony, is a decision within the discretion of the trial court, and its decision will not be disturbed absent an abuse of discretion. See *People v. Thompson*, 2016 IL 118667, ¶ 49; *People v. Loggins*, 2019 IL App (1st) 160482, ¶ 77. A trial court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the court. *People v. Edwards*, 343 Ill. App. 3d 1168, 1183 (2003).

¶ 45    Rule 701 of the Illinois Rules of Evidence sets forth the foundational requirements for an opinion or inference offered by a witness who is not testifying as an expert. Ill. R. Evid. 701 (eff. Jan. 1, 2011). Rule 701 provides that a lay witness's testimony, opinions, and inferences are limited to those which are "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid 701 (eff. Jan. 1, 2011).

¶ 46    Rule 702 of the Illinois Rules of Evidence sets forth the foundational requirements for expert opinion testimony. Ill. R. Evid. 702 (eff. Jan. 1, 2011). Rule 702 provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in form of an opinion or otherwise. Ill. R. Evid. 702 (eff. Jan. 1, 2011).

18

¶ 47    Rule 701 and Rule 702 do not distinguish between expert witnesses and lay witnesses, but rather expert testimony and lay opinion testimony. *Loggins*, 2019 IL App (1st) 160482, ¶ 82. A given piece of testimony is either lay testimony or expert testimony. *Loggins*, 2019 IL App (1st) 160482, ¶ 103. Lay opinions and inferences are limited to those "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid 701 (eff. Jan. 1, 2011). If an opinion falls within the scope of Rule 702, it is outside of Rule 701. *Loggins*, 2019 IL App (1st) 160482, ¶ 103.

¶ 48    After reviewing the record, we agree that J.D.'s testimony extended well beyond lay opinions based upon her personal knowledge or lack of knowledge regarding why acetone was detected in her urine. J.D. testified that some nail polish removers contain acetone, and that nail polish remover is not generally used when preparing meth for injection. J.D. admitted that she never "cooked" methamphetamine. Nevertheless, when asked during cross-examination whether she was aware that acetone was used in the production of methamphetamine, she said that "[i]t could be." She went on to state that "when methamphetamine is finished cooking, it is no longer any of the chemical compounds that are being used to make it," and it is that general chemical which is methamphetamine. The testimony about the process of cooking methamphetamine involved specialized scientific knowledge about the effect of heat on chemical compounds at a molecular level and was within the realm of expert testimony. In addition, J.D.'s testimony about whether the presence of acetone in her urine was related to her use of meth and her testimony about the process of cooking methamphetamine were not based upon her personal knowledge or perceptions. The testimony crossed the line into specialized, technical knowledge, and facts unknown to the average person. The State did not tender J.D. to offer expert testimony, nor was she qualified to offer the testimony. Therefore, J.D.'s testimony about whether the presence of

acetone in her urine was related to her use of meth and her testimony about the process of cooking methamphetamine was not properly admissible as lay opinion testimony.

¶ 49   After reviewing the record, we do not find that the admission of this evidence was harmless. The State elicited J.D.'s testimony in support of its theory that the defendant drugged her before sexually assaulting her. This testimony was a piece of evidence to support an element of the offense. J.D.'s testimony was not merely cumulative of other evidence, and the evidence of the defendant's guilt was not overwhelming. We recognize that defense counsel questioned J.D. generally about her knowledge of meth, but this was elicited to establish her lack of knowledge and experience regarding the production or "cooking" of meth. After reviewing the record, we find that this evidence could have contributed to the defendant's conviction. Accordingly, the conviction must be reversed.

¶ 50   Double jeopardy bars retrial after reversal where the evidence at the first trial was not sufficient to support the conviction. See *People v. Olivera*, 164 Ill. 2d 382, 393 (1995); *People v. Jackson*, 348 Ill. App. 3d 719, 738 (2004). As noted above, the evidence at defendant's first trial was sufficient to support his conviction, and therefore a retrial is not barred on double jeopardy grounds. Because our resolution of these issues is dispositive, we will not consider the defendant's other claims of error.

¶ 51                                     III. CONCLUSION

¶ 52   For the reasons stated, the judgment of conviction is reversed and the cause is remanded for a new trial.

¶ 53   Reversed and remanded.