NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 221074-U

NO. 4-22-1074

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 20, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| MIKEAL A. REED, | ) | No. 20CF556 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Albert L. Purham Jr., |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court reversed defendant's first degree murder conviction and remanded the matter for a new trial. The evidence was sufficient to sustain defendant's conviction. However, the failure to define "robbery," which was the predicate offense for felony murder, constituted a clear or obvious error, and the trial evidence was closely balanced. The appellate court addressed multiple evidentiary disputes that were likely to arise again on remand.

¶ 2    A Peoria County jury found defendant, Mikeal A. Reed, guilty of first degree murder (720 ILCS 5/9-1(a)(3) (West 2020)). The trial court sentenced defendant to 30 years in prison. Defendant appeals, challenging the sufficiency of the evidence and identifying numerous purported trial errors. We reverse defendant's conviction based on a plain error in the jury instructions and remand for a new trial.

¶ 3                                  I. BACKGROUND

¶ 4    On September 5, 2020, Terrence Dunigan was shot and killed in Peoria. On September 29, 2020, a grand jury indicted defendant, who was 17 years old, for first degree murder under a felony murder theory in connection with Dunigan's death. The predicate offense for this charge was attempted robbery (720 ILCS 5/8-4(a), 18-1(a) (West 2020)). The State notified the defense it intended to increase the penalty by proving defendant personally discharged a firearm that proximately caused Dunigan's death.

¶ 5    The State also charged Talya Zolicoffer and Keon Patterson in connection with Dunigan's death. Defendant's case proceeded to trial first. The State presented 19 witnesses, most of whom were affiliated with law enforcement. Defendant presented no evidence, other than a stipulation that one of the State's witnesses faced a pending traffic case. The following is a summary of the facts most relevant to defendant's sufficiency-of-the-evidence challenge. In the analysis section, we will supplement the facts to address some of defendant's additional claims.

¶ 6    A. The Circumstances of the Shooting

¶ 7    Aniya Cummings resided at an apartment in a complex in Peoria known as the Woodlands. On the afternoon of Saturday, September 5, 2020, Cummings's boyfriend, Josiah Davis, invited people to gamble by playing dice at Cummings's apartment while Cummings was away. The people who attended this dice game were Davis, Dunigan, Zolicoffer, Davonte Hanson, Quintez Edwards, Kerrington Johnson, and Roland Brown. Brown left the game at some point. At 6:11 p.m., two additional individuals—theorized by the State to be defendant and Patterson— arrived at the apartment complex in a Toyota Corolla and backed into a parking spot. Zolicoffer went out to that car and stood by the passenger side window. About a minute later, Zolicoffer and these two individuals walked toward Cummings's apartment. As they did so, they passed Edwards,

who left Cummings's apartment and walked to his own car, purportedly for the purpose of charging his phone.

¶ 8        Shortly thereafter, Dunigan sustained one gunshot wound to the back of his shoulders that traveled downward, striking multiple organs before lodging in his hip. Lack of soot or stippling around the wound indicated Dunigan was shot from at least two feet away. Dunigan fell to the ground and died on a concrete walkway just outside the door to Cummings's apartment unit.

¶ 9        After the shooting, Zolicoffer and Hanson jumped into Edwards's car, and the three of them drove away. Likewise, the two individuals who had just arrived in the Corolla returned to that Corolla and fled.

¶ 10                            B. The Investigation

¶ 11        Over the next several weeks, police officers developed the theory that the shooting occurred during an attempted robbery, orchestrated by Zolicoffer, of some participants of the dice game. More specifically, the theory was that (1) Zolicoffer directed his friend Patterson to bring a gun to Cummings's apartment, (2) defendant, who was unknown to Zolicoffer, transported both Patterson and a gun to Cummings's apartment, and (3) defendant shot Dunigan after Dunigan began tussling with Patterson. The following is an overview of the investigation that led police officers to this theory.

¶ 12        Police officers found a cartridge case about 6 to 10 feet from the door to Cummings's apartment. No fingerprints were recovered from that cartridge case. Officers never found the murder weapon, and nothing of evidentiary value was recovered from inside Cummings's apartment. Pictures in the record show there was no cash found on the ground near

- 3 -

Dunigan's body, though he had $25 stuffed in his sock. Officers spoke with multiple people, but nobody initially identified the shooter.

¶ 13        Police officers reviewed surveillance videos taken from stationary cameras positioned throughout the Woodlands apartment complex. Upon doing so, officers discerned a partial license plate for the Corolla. The Illinois Secretary of State's office confirmed that the most relevant result associated with that partial license plate was a car registered to defendant's aunt, Miesha Reed, in Peoria. Lieutenant Erin Barisch of the Peoria Police Department testified he went to Reed's home 40 to 50 times after the shooting and never found this Corolla.

¶ 14        Meanwhile, police officers identified Zolicoffer as a suspect and seized his phone the day after the shooting. (Zolicoffer had left this phone at Cummings's apartment, and officers found the phone in Davis's possession.) Upon extracting data from Zolicoffer's phone, officers discovered that shortly before the shooting, Zolicoffer exchanged numerous messages with Patterson via Facebook Messenger. The following are the Facebook Messenger communications between Zolicoffer and Patterson that are most relevant to this case, all of which occurred within about 15 minutes before the shooting:

> • 6:02:02 p.m., message from Zolicoffer: "wya" (Where you at?)
>
> • 6:02:12 p.m., message from Patterson: "Move wtw" (What's the word?)
>
> • 6:02:23 p.m.: Zolicoffer missed a call from Patterson
>
> • 6:02:27 p.m.: There was either a phone call or a message with undiscernible content sent from Zolicoffer to Patterson.
>
> • 6:02:41 p.m., message from Zolicoffer: "rn" (right now)
>
> • 6:02:46 p.m., message from Patterson: "Omw" (on my way)
>
> • 6:02:54 p.m., message from Zolicoffer: "come all da way to da back"

- 6:03:46 p.m. to 6:03:58 p.m.: Patterson sent Zolicoffer three emojis or graphics that were not discernible from the extracted data.

- 6:04:02 p.m., message from Zolicoffer: "u w jt?" (You with J.T.?)

- 6:04:02 p.m., message from Zolicoffer: "hurry up for they stop"

- 6:04:02 p.m., There was another message from Zolicoffer with content that was not discernible from the extraction report.

- 6:04:05 p.m., message from Patterson: "Accident"

- 6:04:18 p.m., message from Patterson: "We got 2"

- 6:04:23 p.m., message from Patterson: "Me n mikeal"

- 6:04:37 p.m., message from Zolicoffer: "ight" (all right)

- 6:04:40 p.m., Zolicoffer missed a call from Patterson.

- 6:04:48 p.m., message from Patterson: "My s*** tweakin"

- 6:08:52 p.m., message from Zolicoffer: "wya" (Where you at?)

¶ 15    The extraction of Zolicoffer's phone also revealed that at 6:10:52 p.m. on the evening of the shooting, a Facebook Messenger user identified as "Ksoo Ksoo" (transcribed repeatedly in the report of proceedings as "Kaso Kaso") sent a message to Zolicoffer that said, "Me n keon in tha woodlands." The State introduced testimony that the uniform resource locator (URL) associated with the "Kaso Kaso" Facebook Messenger account was "https://www.facebook.com/Mikeal.Reed10." However, police officers never applied for search warrants to obtain information from Facebook about the "Kaso Kaso" account or any other account in connection with this case. No witness testified to ever having communicated with defendant at the "Kaso Kaso" account.

¶ 16    The police interviewed Zolicoffer twice. After extensive questioning, he implicated defendant as the person who shot Dunigan.

¶ 17    During the investigation, an attorney who represented defendant advised the police defendant would turn himself in once there was a warrant for his arrest. Barisch testified he informed defendant's attorney once there was a warrant for defendant's arrest. However, defendant did not turn himself in, and he was arrested in Georgia on October 9, 2020.

¶ 18                    C. Eyewitness Testimony

¶ 19    The State presented testimony from three witnesses who claimed to be present at the dice game on September 5, 2020: Davis, Hanson, and Zolicoffer.

¶ 20    According to Davis, immediately before the shooting, he saw Dunigan "tussling" with "some dude with dreads" at the entrance to Cummings's apartment. During his testimony, Davis was not asked to identify either Patterson or defendant as individuals he saw on the day of the shooting. There was no evidence introduced at trial as to whether either Patterson or defendant had dreadlocked hair in September 2020.

¶ 21    Hanson testified he hung out with Edwards and Zolicoffer on the day of the shooting. Hanson denied knowing beforehand there was going to be a robbery. He explained the shooting was preceded by what sounded like somebody "tussling" with Dunigan at the entrance to Cummings's apartment. Hanson testified Zolicoffer was inside the apartment at the time of the shooting. However, Hanson gave conflicting statements to the police on that point. After the shooting, Hanson ran out of Cummings's apartment, got into Edwards's car, and left the scene with Edwards and Zolicoffer. Hanson did not see Zolicoffer grab money off the ground before they left. During his testimony, Hanson was not asked to identify either Patterson or defendant as individuals he saw on the day of the shooting.

¶ 22    Given the importance of Zolicoffer's testimony to the State's case, we will recount his testimony in detail.

¶ 23                    1. *Direct Examination of Zolicoffer*

¶ 24    On direct examination by the prosecutor, Zolicoffer testified as follows.

¶ 25    He was 21 years old and in the custody of the county sheriff. He was facing a first degree murder charge in connection with Dunigan's death. In exchange for his truthful testimony against both defendant and Patterson, the State would allow Zolicoffer to plead guilty to armed robbery; the sentencing range would be 10 to 30 years in prison, and the State would recommend a sentence toward the low end of that range. Zolicoffer had multiple juvenile delinquency adjudications for violent offenses.

¶ 26    Zolicoffer testified that on September 5, 2020, he was hanging out with Edwards and Hanson before they went to Cummings's apartment to shoot dice. Edwards drove the group there in a red Ford, but Zolicoffer did not know what time they arrived. Zolicoffer then played dice with Davis, Edwards, Hanson, Dunigan, and Johnson. Brown was also there for a while, but he left and did not return. Zolicoffer arrived with $400 and lost $350 playing dice. Dunigan and Edwards were winning the game. Unhappy that he was losing money, Zolicoffer testified that he came up with the idea to rob everybody at the dice game except for Edwards and Hanson.

¶ 27    Zolicoffer testified he used Facebook Messenger to text Patterson to come to Cummings's apartment. Zolicoffer was "tight" with Patterson, who was like a little brother to him. Zolicoffer claimed he told Patterson to " 'bring the pipe,' " meaning a gun. Patterson responded by asking where Zolicoffer was. Zolicoffer informed Patterson about his location. Zolicoffer asked Patterson who he was with, and Patterson indicated he was with "Mikeal." Zolicoffer did not know anyone named Mikeal.

¶ 28 Zolicoffer testified he left the apartment to wait by Edwards's car. Patterson texted Zolicoffer when "they" (Patterson and defendant) arrived at the apartment complex. Zolicoffer walked to the passenger side of a car parked "a little bit down from where the apartment was" to speak with Patterson. Zolicoffer identified defendant in court as the person in the driver's seat of this car. Zolicoffer told Patterson to give him the gun. Patterson did not show Zolicoffer a gun; Patterson and defendant just wanted to go in the apartment with Zolicoffer.

¶ 29 According to Zolicoffer, he then walked from this car to Cummings's apartment with Patterson and defendant. As they did so, Edwards left Cummings's apartment to charge his phone. At this point, Zolicoffer was still planning on committing a robbery. Zolicoffer entered Cummings's apartment alone because Dunigan was standing by the door and locked it after Zolicoffer entered. Dunigan did not tell Zolicoffer why he locked the door. Zolicoffer then unlocked and opened the door, announcing to the people inside the apartment that Patterson was coming to shoot dice. However, Zolicoffer did not announce that defendant was coming in.

¶ 30 Zolicoffer testified that after he opened the apartment door, Patterson and defendant tried to enter the apartment. Dunigan started pushing and shoving Patterson. Patterson then pushed Dunigan out of the way. Dunigan fell forward to the ground on his hands and knees, landing on a sidewalk in front of the apartment door. As Dunigan fell, he tossed money into the air. Zolicoffer then saw defendant shoot Dunigan "from a long distance" with a turquoise and black semiautomatic handgun. Through an in-court demonstration, Zolicoffer indicated defendant was 20 to 30 feet away at the time of the shooting. Zolicoffer claimed he yelled, " 'don't shoot,' " when he saw defendant point the gun at Dunigan, but it was too late. Zolicoffer was standing at the door near Patterson when the gunshot went off. None of the other participants of the dice game were near them.

¶ 31 After the shooting, Dunigan laid down on the ground and tried to lift his way back to the apartment by crawling but was unable to do so. Zolicoffer did not see where defendant ran after the shooting. Zolicoffer picked up from the ground some or all of the money Dunigan had tossed, which was about $500. Zolicoffer did not see anybody else take money. After Zolicoffer "sat there in shock for a minute," Hanson pushed him out the door and they ran to Edwards's car. Edwards, Hanson, and Zolicoffer then left the scene.

¶ 32 According to Zolicoffer, later on the night of the shooting, he deleted his Facebook message telling Patterson to bring the gun so Zolicoffer could rob the dice game. He deleted this message because "it was too much information" and he was worried about the police seeing it.

¶ 33 Zolicoffer testified he was interviewed twice by the police. During his first interview on September 8, 2020, he told detectives "somewhat" about the facts surrounding the shooting. He did not mention during that first interview that he saw the person who shot the gun. During his second interview on September 15, 2020, he was accompanied by his attorney and revealed more information.

¶ 34 Zolicoffer acknowledged his purpose in telling Patterson to bring a gun was so that Zolicoffer could rob the dice game. He claimed he did not expect for a shooting to happen and that he "was never shown the gun" before the shooting.

¶ 35 2. *Cross-Examination of Zolicoffer*

¶ 36 On cross-examination, Zolicoffer testified to the following most salient points.

¶ 37 Patterson was like a brother to him. He did not want Patterson to get in any trouble, and he would never say Patterson was the shooter. Prior to September 5, 2020, Zolicoffer did not know defendant. Zolicoffer acknowledged having a Facebook account under the name "Talley Burns," which was the account name associated with him in the extraction report of his phone. He

admitted that his testimony during direct examination was the first time he ever said he left Cummings's apartment with $500.

¶ 38        Zolicoffer denied tipping off Edwards that "this was about to go down." Zolicoffer agreed it "just miraculously happened" that Edwards decided to charge his phone by his car while this went down.

¶ 39        Zolicoffer testified that on numerous occasions during his first interview on September 8, 2020, he told the police there was no robbery. He testified that the police would not take that answer from him and they "kept coming at" him. During his first interview, Zolicoffer told the police he did not know who "Kaso Kaso" was, and the officers told him "Kaso Kaso" was "Mikeal." Zolicoffer testified he still did not know whether "Kaso Kaso" was "Mikeal." Two or three hours into his first interview, Zolicoffer told the police he had " 'to get the story straight.' " The officers then left the room to let him think. An officer returned, told Zolicoffer this was the most important day of his life, and gave him the opportunity to tell his story from the beginning. Zolicoffer again told the police he did not know defendant and that he only knew defendant's name because the police told him. Zolicoffer also told the police he was joking around with Patterson when he stood by the car in the parking lot. Zolicoffer told the police he was not similarly joking around with the driver of that car. When officers asked Zolicoffer whether there was a discussion at the car about the robbery, Zolicoffer responded: " 'We didn't communicate about none of that. It would have been in the messages all of that. I swear to God.' "

¶ 40        Also during the first interview, an officer told Zolicoffer he would get 40 years in prison in this case. Right after that, Zolicoffer told the officers defendant shot Dunigan. At some point, one of the officers asked Zolicoffer, "Be honest with me right now, who shot someone?" Zolicoffer paused. The officer then said, "When you pause like that, I do not believe that Mikeal

pulled that trigger." Zolicoffer responded: "He did, he did. Is that what you all want me to say? He did." Additionally, at the "tail end" of the first interview, Zolicoffer told the police he would swear on his grandmother's ashes that neither he nor Patterson was the shooter; however, he would *not* swear on his grandmother's ashes that defendant *was* the shooter.

¶ 41            On September 10, 2020, Zolicoffer had a recorded telephone call with his parents from the Peoria County jail. During that call, Zolicoffer stated he did not agree to a robbery, did not see the shooting, and that "they" (presumably the police) were mixing his words up. Zolicoffer also denied to his parents that he had deleted messages.

¶ 42            Zolicoffer testified that he hired an attorney and agreed to be reinterviewed on September 15, 2020. At the second interview, Zolicoffer told the police he deleted the message regarding a "pipe" or a gun. However, he kept insisting there was no robbery, and the officers kept saying, " 'oh, no, this was a robbery.' "

¶ 43                           3. *Redirect Examination of Zolicoffer*

¶ 44            On redirect examination, Zolicoffer acknowledged the police were "hard" on him in both interviews. He insisted he was telling the truth in his testimony. Zolicoffer clarified he deleted the message from Facebook Messenger by accessing his inbox through a different phone. He did not know whose car it was that he approached in the parking lot of the apartment complex. However, he knew it was not Patterson's car, as Patterson did not have one.

¶ 45                           4. *Further Re-Cross-Examination of Zolicoffer*

¶ 46            Upon further questioning, Zolicoffer testified he could have, but did not, delete other messages he sent or received immediately before the shooting. He denied seeing a message that said, " 'me and Keon in the Woodlands.' "

¶ 47                           D. The Bail Sheet

¶ 48 Over defendant's objection, the trial court allowed into evidence a certified copy of a bail sheet signed by defendant's mother on December 28, 2020, which listed defendant's address as his aunt's residence in Peoria. The court redacted the amount of defendant's bail from this document.

¶ 49 E. Jury Instructions, Verdict, Sentencing, and Appeal

¶ 50 Defense counsel objected when the prosecutor tendered accountability instructions, as the State's theory was defendant was the shooter. The prosecutor responded it was proper to instruct the jury regarding accountability, as the jury might alternatively think Patterson was the shooter but that defendant was legally responsible for Patterson's actions. The trial court instructed the jury regarding accountability.

¶ 51 As mentioned above, the predicate felony for defendant's felony murder charge was attempted robbery. The jury was instructed as to the meaning of attempt but was not given the definition of robbery.

¶ 52 The jury found defendant guilty of first degree murder. For purposes of the sentencing enhancement, the jury found the State did *not* prove that during the offense of first degree murder, defendant discharged a firearm and proximately caused death to another person. The trial court denied defendant's posttrial motion and sentenced him to 30 years in prison. The court denied defendant's motion to reconsider the sentence. Defendant timely appealed.

¶ 53 II. ANALYSIS

¶ 54 Defendant challenges the sufficiency of the evidence and raises numerous purported trial errors. We hold the evidence was sufficient to sustain defendant's conviction. However, the failure to define "robbery" for the jury constituted plain error in this closely balanced

case, so we must reverse defendant's conviction and remand for a new trial. We will address some additional issues defendant raises that are likely to arise on remand.

¶ 55                                    A. Sufficiency of the Evidence

¶ 56          Defendant divides his challenge to the sufficiency of the evidence into two sections. In the first section, defendant contends no rational trier of fact could have concluded he was accountable for felony murder based on an attempted robbery. Defendant emphasizes that due to the way the State charged him, the State bore the burden to prove he had the specific intent to participate in the robbery of the dice game. Defendant maintains the State failed to prove that. In the second section of his argument, defendant proposes no rational trier of fact could have found he fired the gunshot that killed Dunigan. Defendant acknowledges that the jury's finding regarding the firearm sentencing enhancement "cannot be leveraged" to challenge the sufficiency of the evidence. However, he argues Zolicoffer's testimony was unworthy of being credited.

¶ 57          The State responds that the jury could have reasonably determined defendant participated in the scheme to rob the dice game and was the shooter. According to the State, the jury's finding with respect to the firearm enhancement is irrelevant to our analysis of the sufficiency of the evidence.

¶ 58          In his reply brief, defendant appears to contend that the jury's answer with respect to the firearm enhancement should prevent us from affirming his conviction under a theory that he personally shot Dunigan. At oral argument, defense counsel suggested we should consider the jury's answer with respect to the firearm enhancement as part of weighing the evidence.

¶ 59          Case law is clear that the jury's finding with respect to the firearm enhancement has no bearing on our analysis of the sufficiency of the evidence to sustain defendant's guilt of first degree murder. See *People v. Ealy*, 2019 IL App (1st) 161575, ¶ 25 (rejecting the defendant's

argument that "the jury's verdict—finding him guilty of murder but also finding that the firearm allegation was not proven—necessarily means that the jury found him guilty on a theory of accountability"); *People v. Jackson*, 372 Ill. App. 3d 605, 612 (2007) ("We refuse to consider the answer to the 'special interrogatory' beyond the purpose for which it was asked—whether there could be a sentence enhancement."). Here, it is possible the jury determined defendant was the shooter for purposes of finding him guilty of first degree murder but found to the contrary for purposes of the firearm enhancement the State sought. Although that would be a legally inconsistent verdict, an "inconsistent answer to the special interrogatory is not part of the sufficiency-of-the-evidence analysis." *People v. Reed*, 396 Ill. App. 3d 636, 649 (2009). Such inconsistency could be "the product of juror lenity, compromise, or some other unknowable reason." *Ealy*, 2019 IL App (1st) 161575, ¶ 26.

¶ 60      Defendant suggests our supreme court's recent decision in *People v. Jefferson*, 2024 IL 128676, calls these appellate court cases into question. However, *Jefferson* did not address whether a jury's finding that the State failed to prove a firearm enhancement should be considered by the reviewing court when evaluating the sufficiency of the evidence supporting a murder conviction. Rather, *Jefferson* addressed the unrelated question of whether a jury's finding that the State failed to prove a firearm enhancement must be given preclusive effect on retrial if the first conviction is reversed based on evidentiary errors. Moreover, in its analysis, the court in *Jefferson* asserted: "Standing alone, the jury's negative answer to the special interrogatory in this case is not a finding of fact. Rather, it is simply a determination by the jury that the State failed to prove the sentencing enhancement beyond a reasonable doubt." *Jefferson*, 2024 IL 128676, ¶ 44. That language is consistent with the appellate court authorities cited in the preceding paragraph of our order. Accordingly, notwithstanding the jury's finding with respect to the sentencing enhancement,

when evaluating the sufficiency of the evidence supporting defendant's conviction of first degree murder, we may consider whether the evidence supported a conclusion that defendant personally shot Dunigan.

¶ 61    "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*, 2017 IL 120958, ¶ 35. When reviewing a challenge to the sufficiency of the evidence, our inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The reviewing court does not retry the defendant or "substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." *Gray*, 2017 IL 120958, ¶ 35. "A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Gray*, 2017 IL 120958, ¶ 35.

¶ 62    Here, the State did not charge defendant with intentionally or knowingly murdering Dunigan. Rather, the State charged defendant with felony murder predicated on attempted robbery. At the time of the offense, section 9-1(a)(3) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(3) (West 2020)) provided a person commits first degree murder where, without lawful justification, in performing the acts which cause the death, "he or she is attempting or committing a forcible felony other than second degree murder." The State's theory was that defendant and Patterson assisted Zolicoffer's attempt to rob certain members of the dice game and that Dunigan died during the course of that robbery. The State's primary contention was that defendant personally shot Dunigan.

¶ 63        To be sure, the State's evidence was not overwhelming. The State's case rested heavily on the testimony of Zolicoffer, who (1) implicated himself in the crime, (2) made out-of-court statements that were inconsistent with his testimony, (3) may have been biased in favor of protecting himself and his friend Patterson at the expense of defendant, and (4) may have been biased by the plea agreement he reached in exchange for his testimony. However, the jury was instructed to consider each of those matters when evaluating witness credibility. See Illinois Pattern Jury Instructions, Criminal, No. 3.17 (approved Oct. 17, 2014) (instructing the jury to view with caution and suspicion the testimony of a witness who "says he was involved in the commission of a crime with the defendant"); Illinois Pattern Jury Instructions, Criminal, No. 3.11 (approved Oct. 17, 2014) (instructing the jury to consider a witness's prior inconsistent statements when weighing testimony); Illinois Pattern Jury Instructions, Criminal, No. 1.02 (approved Dec. 8, 2011) (instructing the jury to consider "any interest, bias, or prejudice" a witness may have). For the following reasons, we hold the evidence was sufficient to sustain defendant's conviction.

¶ 64        A reasonable trier of fact could have credited Zolicoffer's testimony that (1) he told Patterson in a Facebook Messenger message to bring a "pipe" (a gun) to Cummings's apartment and (2) Zolicoffer subsequently deleted that message. At 6:04:02 p.m. on September 5, 2020, Zolicoffer sent a communication to Patterson that was not viewable in the extraction report, which could support an inference that this was a message that had been deleted. At 6:04:18 p.m., Patterson wrote to Zolicoffer, "We got 2." It could be a reasonable inference that Patterson made the assertion about having two in response to Zolicoffer's request to bring a gun. We also note that at 6:02:27 p.m., there was either a phone call or a message with undiscernible content sent from Zolicoffer to Patterson. Defendant's assertion in his brief that the conversation between Zolicoffer

and Patterson "reads as a back and forth, without a gap," is not the only reasonable inference that could be drawn from the evidence.

¶ 65          A reasonable trier of fact also could have concluded Patterson knew the purpose of bringing a gun to Cummings's apartment was to commit a robbery. Zolicoffer testified the message he deleted from his Facebook Messenger account was "[t]he message where I told [Patterson] bring the gun so I could rob the dice game." Zolicoffer later responded in the affirmative when asked whether he was "the one that contacted Keon to set up this robbery." This testimony reasonably supports a conclusion that Patterson knew there was going to be a robbery. Furthermore, Zolicoffer's Facebook Messenger message to Patterson, "hurry up for they stop," reasonably could be interpreted as referencing a planned robbery.

¶ 66          A reasonable trier of fact also could have concluded defendant drove Patterson to Cummings's apartment. Zolicoffer testified when he walked outside to speak with Patterson, defendant was in the driver's seat. Zolicoffer's testimony on that point was corroborated by the fact that the most relevant result for a partial license plate discernible from the surveillance video was linked to a car registered to defendant's aunt in Peoria. The surveillance video shows three people walking away from that car and toward Cummings's apartment.

¶ 67          A reasonable trier of fact also could have concluded there was a gun in the car defendant drove. A shooting occurred shortly after defendant and Patterson arrived at the apartment complex. There was no testimony at trial that anyone at the dice game possessed a gun before defendant and Patterson arrived.

¶ 68          A reasonable trier of fact also could have concluded defendant knew about the planned robbery when he drove both Patterson and a gun to Cummings's apartment. Circumstantial evidence makes it a reasonable inference that defendant planned to participate in

- 17 -

the robbery. Defendant backed into a parking space, which could facilitate a quicker escape from the scene. Additionally, somebody sent a Facebook Messenger message to Zolicoffer stating, "Men keon in tha woodlands." Considering that defendant was the only person who arrived at Cummings's apartment complex with Patterson, a reasonable trier of fact could have believed defendant sent this message. Sending this message to Zolicoffer implies defendant was aware of Zolicoffer's recent communications with Patterson. Zolicoffer was unacquainted with defendant, so the only reason defendant would have sent this message to Zolicoffer is if defendant knew Zolicoffer and Patterson had been messaging each other.

¶ 69     Surveillance video indicates Zolicoffer went out to the car occupied by defendant and Patterson and stood by the passenger side door for approximately a minute. Asked what happened at that point, Zolicoffer testified: "I told him [(presumably Patterson)] to give me the gun, but he didn't show no gun, and he just was—he wanted to go in. They wanted to come in the house with me basically." Surveillance video shows three individuals leave the area of this car and walk toward Cummings's apartment. A reasonable inference from this evidence is that either defendant, Patterson, or both were armed when they walked with Zolicoffer toward Cummings's apartment.

¶ 70     The shooting occurred shortly thereafter. Zolicoffer testified he saw defendant shoot Dunigan near the entrance to Cummings's apartment. A reasonable trier of fact could have credited Zolicoffer's testimony on this point. A forensic pathologist determined Dunigan was shot from a distance exceeding 2 feet, and Zolicoffer estimated defendant was 20 to 30 feet away at the time of the shooting. Although the cartridge case was found relatively close to Dunigan's body, there is little rhyme or reason to where a cartridge case could have landed or gotten kicked. Zolicoffer's identification of defendant as the shooter, though not corroborated by any other

witness, was not contradicted either. Zolicoffer's testimony that he picked up cash from the ground was corroborated by the fact that police officers did not find cash laying near Dunigan's body.

¶ 71    Although the State's primary theory was that defendant personally shot Dunigan, the trial court also instructed the jury on principles of accountability. This allowed the jury to find defendant guilty of first degree murder if it determined that (1) either Zolicoffer or Patterson killed Dunigan during an attempted robbery and (2) defendant was accountable for the shooter's actions. Section 5-2(c) of the Code (720 ILCS 5/5-2(c) (West 2020)) provides a person is legally accountable for another's conduct when, "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." This statute continues, in relevant portion:

> "When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts. Mere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability." 720 ILCS 5/5-2(c) (West 2020).

¶ 72    The State may prove a defendant possessed the intent to promote or facilitate a crime by showing either that (1) the defendant shared the principal's criminal intent or (2) there was a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 13. The shared intent theory is not applicable to this case, as no evidence suggested defendant, Zolicoffer, and Patterson

each intended to murder Dunigan. The common criminal design theory is the much broader theory, as it can result in a person being held responsible for crimes he or she did not specifically intend to facilitate or promote. Specifically,

> "[u]nder the common-design rule, if 'two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts.' " *Fernandez*, 2014 IL 115527, ¶ 13 (quoting *In re W.C.*, 167 Ill. 2d 307, 337 (1995)).

" 'Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another.' " *Fernandez*, 2014 IL 115527, ¶ 13 (quoting *W.C.*, 167 Ill. 2d at 338). Thus, the State is not required to prove a defendant's express verbal agreement to the common design. *People v. Garcia*, 2019 IL App (2d) 161112, ¶ 27.

¶ 73     For the reasons explained above, a reasonable trier of fact could have concluded defendant transported both Patterson and a gun to Cummings's apartment with knowledge of Zolicoffer's and Patterson's common design to commit a robbery. Pursuant to the law of accountability, if one these young men shot Dunigan in furtherance of that common design, each of them would be responsible for the shooting. Zolicoffer testified the shooting followed some pushing and shoving between Patterson and Dunigan. That testimony was corroborated by Davis, who saw Dunigan tussling with someone at the door to the apartment before the shooting, and Hanson, who heard tussling. After the shooting, defendant maintained his affiliation with Patterson, fleeing the scene in a car together. Under the circumstances, even if the jury was not

convinced beyond a reasonable doubt that defendant personally shot Dunigan during the attempted robbery, the jury rationally could have been convinced that either defendant, Zolicoffer, or Patterson did so. Under the circumstances, that is enough to uphold defendant's conviction.

¶ 74 The State also presented evidence that defendant was arrested in Georgia after his attorney was informed a warrant had been issued in Illinois for his arrest. Although the defense attempted to justify defendant's presence in Georgia, a rational jury could have viewed defendant's flight from Illinois as evidence of consciousness of guilt.

¶ 75 We recognize this is a very close case that required the jury to draw multiple inferences to find defendant guilty. Nevertheless, it is not our role to retry defendant, and we must respect that "it was the fact finder who saw and heard" Zolicoffer testify. *Cunningham*, 212 Ill. 2d at 279-80. It is evident the jury credited significant portions, if not all, of Zolicoffer's testimony. In reviewing the sufficiency of the evidence, a reviewing court may find testimony insufficient "only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280. Having carefully reviewed the record, despite the faults with Zolicoffer's testimony that defendant emphasized at trial and reiterates on appeal, a reasonable jury could have accepted Zolicoffer's testimony as true.

¶ 76 B. Challenges to the Jury Instructions

¶ 77 Defendant next identifies two purported errors in the jury instructions: (1) the trial court gave an attempt instruction (Illinois Pattern Jury Instructions, Criminal, No. 6.05 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 6.05)) and (2) the court failed to provide the definitional instruction for robbery (Illinois Pattern Jury Instructions, Criminal, No. 14.01 (approved Dec. 8., 2011) (hereinafter IPI Criminal No. 14.01)). Defendant acknowledges he failed to preserve these issues for review. However, he invokes both prongs of the plain error doctrine.

¶ 78    The State responds that the trial court properly gave IPI Criminal No. 6.05. The State concedes the court committed a clear or obvious error by failing to instruct the jury with IPI Criminal No. 14.01. However, the State argues defendant is not entitled to relief for that error pursuant to the plain error doctrine.

¶ 79    A defendant who fails to tender a jury instruction generally may not challenge the trial court's failure to provide such instruction. *People v. Sargent*, 239 Ill. 2d 166, 188 (2010). Nevertheless, Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." A defendant may obtain relief pursuant to the plain error doctrine by demonstrating a clear or obvious error occurred and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the error is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Sargent*, 239 Ill. 2d at 189. Typically, the threshold inquiry is to determine whether any error occurred. *Sargent*, 239 Ill. 2d 189. If the reviewing court determines an error occurred, the court then considers whether the defendant has satisfied either prong of the plain error doctrine. *Sargent*, 239 Ill. 2d 189-90.

¶ 80    We hold the trial court properly instructed the jury with IPI Criminal No. 6.05, which defines "attempt." Illinois Pattern Jury Instructions, Criminal, No. 7.01 (approved Jan. 30. 2015) (hereinafter IPI Criminal No. 7.01) provides the definition instruction for first degree murder where, as in this case, the offense is alleged to have occurred before July 1, 2021. Consistent with both the indictment and IPI Criminal No. 7.01, the court here instructed the jury that "[A] person commits the offense of First Degree Murder when he kills an individual if, in performing the acts

which cause the death, he is attempting to commit the offense of Robbery." The Committee Note to IPI Criminal No. 7.01 states: "Give Instruction 6.05, defining the offense of attempt following the definition of the forcible felony, when the basis for an instruction on felony murder is an alleged attempt to commit a forcible felony." The Committee Note to IPI Criminal No. 7.01 expressly directed the court to instruct the jury with IPI Criminal No. 6.05, so the court did not commit a clear or obvious error by providing that instruction.

¶ 81        However, as the State concedes, the trial court should have, but did not, instruct the jury with IPI Criminal No. 14.01. This instruction would have informed the jury that "A person commits the offense of robbery when he [(intentionally) (knowingly) (recklessly)] takes property from the person or the presence of another by the use of force or by threatening the imminent use of force." As mentioned, the Committee Note to IPI Criminal No. 7.01 says a court should "[g]ive Instruction 6.05, defining the offense of attempt *following the definition of the forcible felony*, when the basis for an instruction on felony murder is an alleged attempt to commit a forcible felony." (Emphasis added.) Additionally, the Committee Note to IPI Criminal No. 6.05 states: "*The court must also give an instruction that defines the offense which is the alleged subject of the attempt*. However, the issues instruction for that offense should not be given in conjunction with the attempt instruction." (Emphasis added.) In *People v. Walker*, 392 Ill. App. 3d 277, 296-97 (2009), which involved a felony murder prosecution predicated on attempted armed robbery, the court explained that the pattern instructions require instructing the jury regarding the definition of the predicate felony. Here, as the State concedes, the failure to instruct the jury with the definition of robbery amounted to a clear or obvious error. See *People v. Edwards*, 343 Ill. App. 3d 1168, 1175-76 (2003) (determining the jury should have been instructed with the definition of robbery, which served as the predicate for the felony murder charge).

¶ 82    The question, then, becomes whether this error justifies relief under either prong of the plain error doctrine. In *Edwards*, the Second District held that failure to define the predicate felony was not the type of "grave error" that categorically required a new trial pursuant to the second prong of the plain error doctrine. *Edwards*, 343 Ill. App. 3d at 1178-80. As part of its analysis on that point, the court reasoned that " 'robbery' " is a "simple word[ ]" that would be within the common understanding of the jury. *Edwards*, 343 Ill. App. 3d at 1180. The court also determined the first prong of the plain error doctrine did not apply, as the evidence against the defendant was not closely balanced. *Edwards*, 343 Ill. App. 3d at 1180.

¶ 83    We need not consider whether the failure to instruct the jury with the definition of robbery constituted second prong plain error. Unlike in *Edwards*, the evidence here was closely balanced. A case may be closely balanced even where the defendant presents no evidence or alibi. See *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007) ("Although defendant has the burden before this court to show that the evidence is closely balanced, he had no burden to present any evidence or to testify himself at trial."). "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. Although we held above that the evidence was sufficient to sustain defendant's conviction, that is a distinct issue from whether the evidence was closely balanced. See *Sebby*, 2017 IL 119445, ¶ 60 ("The issue before us *** does not involve the sufficiency of close evidence but rather the closeness of sufficient evidence."). The State's case largely depended on Zolicoffer, whose testimony a different reasonable jury could have rejected. No other witness—including two people who were present when the shooting occurred—testified that defendant assisted with an attempted robbery or shot Dunigan. There was no forensic evidence linking defendant to the shooting, and defendant

never made any inculpatory statements. Under these circumstances, the evidence was closely balanced. Accordingly, defendant is entitled to a new trial pursuant to the first prong of the plain error doctrine. See *Sebby*, 2017 IL 119445, ¶ 69 ("The only question in a first-prong case, once clear error has been established, is whether the evidence is closely balanced.").

¶ 84 Having held the evidence was sufficient to support defendant's conviction, there is no double jeopardy bar to retrial.

¶ 85 C. The Other Issues Defendant Raises on Appeal

¶ 86 We next consider whether any of the other issues defendant raises are likely to recur on remand. See *People v. Hari*, 218 Ill. 2d 275, 299 (2006) (noting that a reviewing court, after ordering a new trial, may address other issues that are likely to arise during the retrial).

¶ 87 As to the issue of whether the trial court should have granted defendant's request for a mistrial rather than instructing the jury to disregard an irrelevant and prejudicial video clip showing Dunigan's mother screaming and wailing for Jesus to bring her son back, we are confident the State will not attempt to introduce this video clip on retrial. We also need not focus too long on defendant's claim he is entitled to a new trial due to improper comments by the prosecution. Defendant has indeed identified some remarks by the prosecution that were clearly unprofessional or not based on the evidence presented. For example, there was no reason for the prosecution to assert that defense counsel was trying to keep information from the jury by lodging an objection. Nor was there an evidentiary basis for the prosecution to reference the adage "snitches get stiches" in closing arguments to insinuate that Davis and Hanson initially withheld information from the police due to fear of retaliation. We underscore that all attorneys are expected to act professionally on retrial, avoid extraneous side comments, and confine their arguments to reasonable inferences from the evidence presented. Further, our resolution of this appeal on plain error grounds obviates

the need to address defendant's contention that cumulative trial errors deprived him of his right to a fair trial.

¶ 88　　　　　Defendant raises seven other evidentiary arguments, many of which will likely arise on remand. We will discuss each of these issues.

¶ 89　　　　　　　　　　　　　　　　　1. *Facebook URL*

¶ 90　　　　　Defendant argues a detective improperly testified the URL associated with the "Kaso Kaso" Facebook Messenger account was "https://www.facebook.com/Mikeal.Reed10." Defendant contends this URL was hearsay. He further submits the State failed to authenticate that he used this account.

¶ 91　　　　　The State responds that the URL was not hearsay because (1) defendant's name was not intended as an assertion and (2) a party's own statement is not hearsay when offered against him. The State submits it laid a sufficient foundation for admitting evidence relating to the message Zolicoffer received from "Kaso Kaso."

¶ 92　　　　　Upon extracting data from Zolicoffer's phone, police officers learned a Facebook Messenger account labeled "Ksoo Ksoo" (transcribed at trial as "Kaso Kaso") sent a message to Zolicoffer's account shortly before the shooting saying, "Me n keon in tha woodlands." At trial, the parties and the trial court focused more on the issue of hearsay than the authentication of the "Kaso Kaso" account. The court ruled that the URL associated with this account was "permissible hearsay," as it was "offered for some other purpose" the court did not specify. However, the hearsay issue is linked with the question of whether the State authenticated defendant as the person who sent the message from the "Kaso Kaso" account shortly before the shooting. If defendant was the user of this account who sent that message, then none of this evidence is hearsay. See Ill. R. Evid. 801(d)(2)(A) (eff. Oct. 15, 2015) (establishing that statements of a party-opponent offered

against that party are not hearsay). In other words, if the State properly authenticated this evidence, there is no hearsay problem.

¶ 93    "The Illinois Rules of Evidence provide that authentication as a 'condition precedent' to the admissibility of evidence is satisfied 'by evidence sufficient to support a finding that the matter in question is what its proponent claims.' " *People v. Brand*, 2021 IL 125945, ¶ 36 (quoting Ill. R. Evid. 901(a) (eff. Jan. 1, 2011)). "[R]eliability may be established when a witness testifies as to the distinctive characteristics of the electronic communication as a foundational basis for proving the source of the electronic communication." *Brand*, 2021 IL 125945, ¶ 40; see Ill. R. Evid. 901(b)(4) (eff. Sept. 17, 2019) (allowing a party to authenticate electronic communications through "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics," "taken in conjunction with the circumstances"). Thus, a party may authenticate an item through circumstantial evidence. *Brand*, 2021 IL 125945, ¶ 53. "The admissibility of evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion." *Brand*, 2021 IL 125945, ¶ 36. "An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the trial court's position." *Brand*, 2021 IL 125945, ¶ 36.

¶ 94    In some cases, the State links a defendant to a particular electronic account by proving the defendant had a history of using it. See *Brand*, 2021 IL 125945, ¶ 53 (noting that the victim testified the defendant had a history of sending her Facebook Messenger messages from an account labeled "Masetti Meech"); *People v. Curry*, 2020 IL App (2d) 180148, ¶ 10 (recounting that the victim testified she had been Facebook friends with the defendant for two years). Here, by contrast, no witness testified to having personal knowledge that defendant used Facebook Messenger. Moreover, Zolicoffer, who was the recipient of the message from "Kaso Kaso," denied

seeing that message, knowing who "Kaso Kaso" was, and knowing defendant. Police officers also never sought a search warrant to procure records from Facebook, which might have shed light on whether defendant used the "Kaso Kaso" account.

¶ 95    The fact that the URL associated with the "Kaso Kaso" account bore defendant's name was insufficient in itself to authenticate defendant as the user of the account or as the person who sent the relevant message. See *People v. Kent*, 2017 IL App (2d) 140917, ¶ 104 (holding that the State failed to link a Facebook post to the defendant, even though the Facebook account bore the defendant's nickname and appeared to have his picture on it); *People v. Watkins*, 2015 IL App (3d) 120882, ¶ 38 (holding that the mere fact that an unknown person exchanged drug-related text messages with a person named "Charles" was not enough to show that the defendant, who was named Charles, participated in those communications).

¶ 96    Nevertheless, other circumstantial evidence linked defendant to the "Kaso Kaso" account. The message that "Kaso Kaso" sent to Zolicoffer's account indicated the sender was with "keon" at the apartment complex where the dice game was happening shortly before the shooting. Zolicoffer testified that before the shooting, he exchanged messages with Keon Patterson. A message in the record from Patterson to Zolicoffer indicated Patterson was with "mikeal," which is defendant's first name. Zolicoffer testified he encountered Patterson and defendant together in a car before the shooting. Other evidence in the record supported the conclusion that defendant and Patterson arrived at and later fled the scene of the crime in a car registered to defendant's aunt. Under these circumstances, there is a reasonable basis in the evidence to conclude the State authenticated defendant as the person who sent the message from the "Kaso Kaso" account.

¶ 97                                  2. *Police Reports*

¶ 98 Defendant also argues the trial court improperly admitted People's exhibits Nos. 36 and 38, which he contends were police reports constituting inadmissible hearsay. The State responds that admitting these exhibits was proper, as the exhibits established the foundation for expert testimony. In his reply brief, defendant points out there was no expert testimony to which these exhibits related.

¶ 99 Defendant's argument is well-taken as to People's exhibit No. 36. That exhibit is a "Digital Forensic Analysis Report" prepared by Officer Clint Rezac of the Peoria Police Department on September 8, 2020. In this exhibit, Rezac explained the steps he took to extract data from Zolicoffer's phone. This exhibit is in the nature of a police report, and it should not have been admitted into evidence. See *People v. Williams*, 240 Ill. App. 3d 505, 506 (1992) ("While it is true that police reports may be used for impeachment or refreshing a witness' recollection, it is well-settled that police reports are inadmissible hearsay not subject to any recognized exception to the hearsay rule."). The State is misguided in arguing this report provided the foundation for expert testimony, as the State did not present any expert with respect to digital evidence.

¶ 100 However, we reject defendant's argument with respect to People's exhibit No. 38. That exhibit was not a police report in the traditional sense. Rather, People's exhibit No. 38 contained selected portions of the data extracted from Zolicoffer's phone that Rezac believed were relevant to the investigation. Accordingly, defendant's contention that this exhibit was an inadmissible police report is unpersuasive.

¶ 101 3. *Facebook Messenger Messages Between Patterson and Zolicoffer*

¶ 102 Defendant further argues the messages Patterson and Zolicoffer exchanged were hearsay. The State responds that these messages among coconspirators were not hearsay. See Ill. R. Evid. 801(d)(2)(E) (eff. Oct. 15, 2015) (indicating a statement is not hearsay if it is offered

against a party and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy"). In reply, defendant notes the State did not seek to admit these messages as coconspirator statements.

¶ 103    Defendant is correct that the State did not raise this theory at trial. However, in ruling on defendant's posttrial motion, the trial court seemed to suggest, in passing, that the coconspirator exception applied. To avail itself of the coconspirator exception to the hearsay doctrine, "the State must provide evidence establishing a *prima facie* showing of a conspiracy in which the defendant was involved." *People v. Harper*, 2017 IL App (4th) 150045, ¶ 45. "The evidence establishing the *prima facie* showing must be 'sufficient, substantial, and independent of the declarations made.' " *Harper*, 2017 IL App (4th) 150045, ¶ 45 (quoting *People v. Duckworth*, 180 Ill. App. 3d 792, 795 (1989)). Given the State's failure to invoke the coconspirator exception below and the lack of specific findings by the court for us to review, we will not address this issue in the first instance. On remand, the parties may litigate whether the messages between Patterson and Zolicoffer are admissible as coconspirator statements.

¶ 104                    4. *Rehabilitation of Hanson*

¶ 105    Defendant next argues the trial court improperly allowed the State to rehabilitate Hanson on redirect examination with a prior consistent statement. The State responds that the court properly allowed rehabilitation pursuant to the doctrine of completeness.

¶ 106    The testimony defendant complains about from the State's redirect examination of Hanson was essentially the same testimony defense counsel elicited from Hanson on cross-examination—*i.e.*, that Hanson made inconsistent statements to the police during the same interview as to whether Zolicoffer was inside Cummings's apartment at the time of the shooting. Given the lack of prejudice to defendant and that we have already reversed and remanded for a

- 30 -

new trial, there is nothing left for us to review with respect to this issue that could guide the parties on remand.

¶ 107                                    5. *Evidence of Flight*

¶ 108        Defendant also argues the trial court should not have allowed the State to present evidence that he fled to Georgia after the murder to argue consciousness of guilt. Defendant contends he was not hiding from the prosecution but was simply living in Georgia with his mother. Thus, he argues, the evidence of his arrest in Georgia was either irrelevant or the relevance was substantially outweighed by its prejudicial impact. The State responds that the court properly allowed this evidence, as defendant did not turn himself in after the police advised his attorney of an active arrest warrant.

¶ 109        We discern no abuse of discretion. Evidence of flight may be admissible as proof of consciousness of guilt. *People v. Harris*, 225 Ill. 2d 1, 23 (2007). Here, the evidence supported a conclusion that defendant was aware the police wanted to speak with him in connection with this case, as his former attorney had multiple discussions with the police about defendant turning himself in. According to Barisch, he eventually informed defendant's attorney there was an active warrant for defendant's arrest. Although defendant's attorney told Barisch his intention was to bring defendant to the police station to turn himself in, Barisch never heard back from the attorney, and defendant was ultimately arrested in Georgia. This evidence provided a reasonable basis for the State to argue defendant fled to Georgia to avoid prosecution. Accordingly, the evidence was relevant, and its relevance was not substantially outweighed by its prejudicial impact.

¶ 110                                    6. *Bail Sheet*

¶ 111        Defendant next argues the trial court erroneously admitted into evidence People's exhibit No. 40, which was a bail sheet defendant's mother signed on December 28, 2020. The

address listed for defendant in this exhibit corresponded to his aunt's address, to which the suspect Corolla was registered. Defendant contends this exhibit was hearsay. He also seems to challenge the relevance of this exhibit, as he asserts it did not establish he "had any relationship with that address at the time of the offense or at any time when the car was being used."

¶ 112    The State responds that People's exhibit No. 40 is not hearsay, as it qualifies as a party-opponent admission and is a public record.

¶ 113    In his reply brief, defendant cites Illinois Rule of Evidence 403 (eff. Jan. 1, 2011), which provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

¶ 114    The trial court conceded it was "not wild" about allowing the bail sheet into evidence. Putting aside the hearsay issue, any probative value in this exhibit was clearly and substantially outweighed by its prejudicial impact. The purported relevance of the bail sheet was that it showed defendant resided with his aunt, to whom the Corolla was registered. However, the bail sheet shed little light on whether defendant lived with his aunt on the day of the shooting, as it was dated almost four months after the shooting. By contrast, this exhibit improperly highlighted to the jury that defendant was placed on bail, which had no bearing on the issues for the jury to decide. The jury also learned through this exhibit that defendant was not allowed to leave Illinois without leave of court, which could have given jurors the impression that the court believed defendant was a flight risk. Admittedly, it would have been a far more serious error had the court not redacted the amount of bail from this exhibit. See *People v. Salgado*, 353 Ill. App. 3d 605, 611 (2004) (reversing and remanding for a new trial where the State improperly introduced evidence

of the amount of the defendant's bail). Nevertheless, the potential for prejudice from the bail sheet here far outweighed any probative value. The bail sheet should not be admitted on retrial.

¶ 115                            7. *Lay Witness Video Identifications*

¶ 116          Finally, defendant argues Officer Richard Linthicum of the Peoria Police Department improperly identified "certain persons and events from the surveillance video." According to defendant, Linthicum lacked personal knowledge of the matters to which he testified and was in no better position than the jury to interpret the video evidence. The State responds that such narration was admissible and helpful to the jury, given the difficulty of ascertaining the relevant events from the video.

¶ 117          The State had Linthicum narrate the surveillance videos even though he did not witness the events depicted. Linthicum also identified Zolicoffer, Edwards, and Hanson on the video clips. Linthicum claimed he learned who those people were on the videos through his investigation, which suggested he was relying on hearsay information. Although defense counsel initially raised an objection to Linthicum narrating the videos, counsel then said he had no objection to Linthicum identifying Zolicoffer. When Linthicum subsequently identified Edwards and Hanson, defense counsel did not raise an objection. Thus, defendant affirmatively invited any error or at least failed to preserve his arguments for purposes of this appeal.

¶ 118          For the benefit of the parties on remand, we note that Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) provides:

> "If the witness is not testifying as an expert, the witness' testimony in the
> form of opinions or inferences is limited to those opinions or inferences which are
> (a) rationally based on the perception of the witness, and (b) helpful to a clear
> understanding of the witness' testimony or the determination of a fact in issue, and

(c) not based on scientific, technical, or other specialized knowledge within the

scope of Rule 702."

The State is correct that the distance from which some of the surveillance footage was captured made it "difficult to see and figure out where" jurors needed to look when viewing those particular video clips. Nevertheless, on remand, consistent with Rule 701(a), a lay witness should not identify individuals from the surveillance footage unless such identifications are rationally based on the witness's own perception.

¶ 119                                    III. CONCLUSION

¶ 120          For the reasons stated, we reverse defendant's conviction of first degree murder and remand for a new trial.

¶ 121          Reversed and remanded.